**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GUY RATZ, Individually and on behalf of all others similarly situated, | : : : | |
| Plaintiff, | : : | CIVIL ACTION NO.: 2:13-cv-06808-PSD |
| vs. | : : | |
| PHOTOMEDEX, INC., DENNIS M. MCGRATH and DOLEV RAFAELI, | : : : | |
| Defendants. | : : | |
| _____ | : | July 14, 2014 |

---

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO THE
MOTION TO DISMISS THE AMENDED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS**

---

| | |
|---|---|
| Scott R. Shepherd<br>James C. Shah<br>Eric L. Young<br>SHEPHERD, FINKELMAN, MILLER<br> & SHAH, LLP<br>35 East State Street<br>Media, PA 19063<br>Telephone: (610) 891-9880<br>Facsimile:  (866) 300-7367<br>Email:  sshepherd@sfmslaw.com<br>         jshah@sfmslaw.com<br>         eyoung@sfmslaw.com | James E. Miller<br>Laurie Rubinow<br>Karen Leser-Grenon<br>SHEPHERD, FINKELMAN, MILLER<br> & SHAH, LLP<br>65 Main Street<br>Chester, CT 06412<br>Telephone: (860) 526-1100<br>Facsimile: (866) 300-7367<br>Email: jmiller@sfmslaw.com<br>        lrubinow@sfmslaw.com<br>        kleser@sfmslaw.com |

**Attorneys for Lead Plaintiff
and the Proposed Class**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.   INTRODUCTION AND PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     A. Legal Standard for a Rule 12(b)(6) Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     B. Standard for Violation of the Exchange Act . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     C. The Complaint Sufficiently Alleges False and Misleading Statements . . . . . . . . . . 19

          1.   Defendants' Material Misstatements And Omissions About The No!No!
               Device . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

          2.   Defendants' Material Misstatements And Omissions About Its Japanese
               Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

          3.   The Pre-Class Period Disclosures Did Not Reveal The Facts That
               Defendants Concealed From Investors And About Which Defendants
               Affirmatively Misled Investors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

     D.   Defendants' Arguments That They Had No Duty To Speak And That Their
          Omissions Are Not Actionable Finds No Support In The Law . . . . . . . . . . . . . 33

     E.   Defendants' Misstatements Are Not Statements of "Belief and Opinion" . . . . . 34

     F.   Defendants Are Not Shielded from Liability by the Safe Harbor . . . . . . . . . . . 36

          1.   Defendants' Statements Are Not Forward Looking . . . . . . . . . . . . . . . . 36

          2.   The Misstatements Were Not Accompanied by Cautionary Language . . 39

     G.   The Misstatements Are Material and Are Not Mere Puffery . . . . . . . . . . . . . . 41

H.      Plaintiffs' Allegations Raise a Compelling Inference of Defendants' Scienter . . 41

      1.      Plaintiffs' Allegations Must Be Considered Holistically in Determining Whether They Raise a Strong Inference of Scienter . . . . . . . . . . . . . . . . 41

      2.      The Complaint Alleges Conscious Misbehavior and/or Recklessness . . 43

            a.      Defendants, As The Top Executives Of The Company, And Based Upon Their Specific Statements And Acknowledgments, Raise An Inference Of Their Knowledge Regarding The Company's Core Product, Its Lack Of Efficacy And The Actual Status Of Its Operations In Japan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

            b.      Defendants' Knowledge Regarding The Lack Of Efficacy Of The No!No! Device And Falling Sales In Japan . . . . . . . . . . . . . . . . . 48

            c.      Defendants' Failure To Seek FDA Approval Of The No!No! Device Strongly Supports The Averments Of Scienter . . . . . . . . 49

            d.      Defendants' Apparent Change In Their Consumer Advertising As A Result Of The Confidential *Tria* Settlement While They Continued To Misrepresent Facts Regarding The Efficacy Of The No!No! Device Likewise Provides Strong Support For The Scienter Averments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

            e.      Defendants' Massive Sell-Off While In The Possession Of Material, Adverse Inside Information . . . . . . . . . . . . . . . . . . . . . 52

            f.      Defendants' Large Stock Repurchases To Prop Up The Price Of Company Stock While They Disposed Of Enormous Quantities Of PhotoMedex Stock At Inflated Prices . . . . . . . . . . . . . . . . . . . . . 55

      3.      The Complaint Alleges That Defendants Had Motive and Opportunity to Commit Securities Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

I.      Defendants' Quarrel With Lead Plaintiff's Confidential Witness Descriptions Is Without Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

J.      The Complaint More Than Adequately Pleads Loss Causation . . . . . . . . . . . . 63

K.      Defendants' "Reservation Of Rights" In Anticipation Of Halliburton II Provides No Additional Basis To Argue For Dismissal Of The Complaint . . . . . . . . . . . 70

L.  The Complaint Adequately Pleads A Section 20(a) Claim Against The Individual Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

M.  In The Alternative, The Court Should Grant Lead Plaintiff Leave To Amend The Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Page

*Anderson v. Peregrine Pharmaceuticals, Inc.*,
    2013 WL 4780059 (C.D. Cal., Aug. 23, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Basic v. Levison*,
    485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 64, 69, 70

*Beissinger v. Rockwood Computer Corp.*,
    529 F. Supp. 770 (E.D. Pa. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Bryn Mawr Hosp. v. Coatesville Elec. Supply Co.*,
    776 F. Supp. 181 (E.D. Pa. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Cal. Pub. Employees Ret. Sys. v. Chubb Corp.*,
    2002 U.S. Dist. LEXIS 27189 (D.N.J. June 26, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Chill v. Gen Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*City of Hialeah Employees Ret. Sys. v. Toll Bros., Inc.*,
    2008 U.S. Dist. LEXIS 66906 (E.D. Pa. Aug. 29, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Conley v. Gibson*,
    355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*DeMarco v. Robertson Stephens Inc.*,
    318 F. Supp. 2d 110 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 63, 64

*EP Medsystems, Inc. v. Echocath, Inc.*,
    235 F.3d 865 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 36, 41

*Eckstein v. Balcor Film Investors*,
    8 F.3d 1121 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir.1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Ellis v. Chao*,
   336 F.3d 114 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   180 L. Ed. 2d 24 (U.S. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Feiner v. SS&C Techs.*,
   11 F. Supp. 2d 204 (D. Conn. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Foman v. Davis*,
   371 U.S. 178 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Forgarazzo v. Lehman Bros, Inc.*,
   341 F. Supp. 2d 274 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Frater v. Hemispherx Biopharma, Inc.*,
   2014 WL 272027 (E.D. Pa. Jan. 24, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 24, 61

*Freedom Med., Inc. v. Gillespie*,
   2007 U.S. Dist. LEXIS 63720 (E.D. Pa. Aug. 29, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*GSC Paryners CDO Fund v. Washington*,
   368 F.3d 228 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Garfield v. NDC Health Corp.*,
   466 F.3d 1255 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Gargiulo v. Demartino*,
   2007 U.S. Dist. LEXIS 71316 (E.D. Pa. Sept. 26, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 40

*George v. China Automotive Systems, Inc.*,
   2012 WL 3205062 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Gerber v. Bowditch*,
   2006 U.S. Dist. LEXIS 27552 (D. Mass. May 8, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Gerber v. Moisel*,
   2003 U.S. Dist. LEXIS 20797 (E.D. Pa. Nov. 13, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  2014 U.S. LEXIS 4305 (U.S. June 23, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69, 70, 71

*Hayes v. Gross*,
  982 F.2d 104 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*In re AOL Time Warner Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Advanta Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 40, 42

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 47

*In re Am. Bank Note Holographics Sec. Litig.*,
  93 F. Supp. 2d 424 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24

*In re CIGNA Corp. Sec. Litig.*,
  459 F. Supp. 2d 338 (E.D. Pa. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*In re CRM Holdings, Ltd. Sec. Litig.*,
  2012 WL 1646888 (S.D.N.Y. Mar. 4, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 71

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Cell Pathways, Inc. Sec. Litig.*,
  2000 U.S. Dist. LEXIS 8584 (E.D. Pa. June 21, 2000) . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Centocor, Inc. Sec. Litig. III,*
  1998 WL 964184 (E.D. Pa. Dec. 1, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*In re Cisco Systems Inc. Sec. Litig.*,
  2013 WL 1402788 (N.D. Cal. Mar. 29, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*In re Comnicom Group, Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*In re Countrywide Financial Corp. Sec. Litig.*,
  588 F. Supp.2d 1132 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57, 59

*In re Donald J. Trump Casino Sec. Litig.*,
  7 F.3d 357 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*In re FreeMarkets, Inc. Sec. Litig.*,
  2000 WL 33914766 (W.D. Pa. Dec. 26, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Ibis Tech. Sec. Litig.*,
  422 F. Supp. 2d 294 (D. Mass. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*In re Intelligroup Sec. Litig.*,
  527 F. Supp. 2d 262 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*In re Kulicke & Soffa Indus., Inc. Sec. Litig.*,
  697 F. Supp. 183 (E.D. Pa. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Loewen Group Inc. Sec. Litig.*,
  2004 U.S. Dist. LEXIS 16601 (E.D. Pa. Aug. 18, 2004) . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Lucent Techs., Inc. Sec. Litig.*,
  217 F. Supp. 2d 529 (D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 39

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*In re MicroStrategy, Inc. Sec. Litig.*,
  115 F. Supp. 2d 620 (E.D. Va. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*In re MobileMedia Sec. Litig.*,
  28 F. Supp. 2d 901 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 37, 40

*In re Nash Finch Co. Sec. Litig.*,
  502 F. Supp. 2d 861 (D. Minn. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Nice Sys., Ltd. Sec. Litig.*,
   135 F. Supp. 2d 551 (D.N.J. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*In re NutriSystem, Inc. Securities Litigation*,
   653 F.Supp. 2d 563 (E.D. Pa. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*In re RAIT Fin. Trust Sec. Litig.*,
   2008 U.S. Dist. LEXIS 103549 (E.D. Pa. Dec. 22, 2008) . . . . . . . . . . . . . . . . . . . . . 19, 31, 47, 59

*In re Radian Sec. Litig.*,
   612 F. Supp. 2d 594 (E.D. Pa. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*In re Ravisent Techs., Inc. Sec. Litig.*,
   U.S. Dist. LEXIS 13255 (E.D. Pa. July 12, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Reliance Sec. Litig.*,
   91 F. Supp. 2d 706 (D. Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
   2005 U.S. Dist. LEXIS 32190 (D.N.J. Dec. 12, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*In re Stone & Webster, Inc., Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 71

*In re Tel-Save Sec. Litig.*,
   1999 U.S. Dist. LEXIS 16800 (E.D. Pa. Oct. 19, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Tibco Software, Inc.*,
   2006 WL 1469654 (N.D. Cal. May 25, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*In re Tseng Labs, Inc. Sec. Litig.*,
   954 F. Supp. 1024 (E.D. Pa. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Unisys Corp. Sec. Litig.*,
   U.S. Dist. LEXIS 13500 (E.D. Pa. Sept. 21, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*In re Veritas Software Corp. Sec. Litig.*,
2006 U.S. Dist. LEXIS 32619 (D.Del. May 23, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*In re Vicuron Pharms., Inc. Sec. Litig.*,
2005 U.S. Dist. LEXIS 15613 (E.D. Pa. July 1, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 47

*In re Viropharma, Inc., Sec. Litig.*,
2003 U.S. Dist. LEXIS 5623 (E.D. Pa. April 3, 2003) . . . . . . . . . . . . . . . . . . . . . 38, 39, 47, 59

*In re Vivendi Universal, S.A. Sec. Litig.*,
381 F. Supp. 2d 158 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*In re Wilmington Trust Securities Litigation*,
852 F.Supp.2d 477 (D. Del. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Winstar Communications*,
2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 69

*Immune Response Securities Litigation*,
375 F.Supp. 2d 983 (S.D. Cal. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Institutional Investors Group v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Jackson v. Rohm & Haas Co.*,
2007 U.S. Dist. LEXIS 71858 (E.D. Pa. Sept. 26, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Jaroslawicz v. Engelhard Corp.*,
704 F.Supp. 1296 (D.N.J. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Kropelnicki v. Siegel*,
290 F.3d 118 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*La. Mun. Police Employees' Ret. Sys. v. Green Mt. Coffee Roasters, Inc.*,
2013 U.S. Dist. LEXIS 178759 (D. Vt. Dec. 20, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Lawrence E. Jaffe Pension Plan v. Household Int'l, Inc.*,
2006 U.S. Dist. LEXIS 83628 (N.D. Ill. Nov. 13, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Maher v. Durango Metals, Inc.*,
144 F.3d 1302 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71, 72

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Malin v. XL Capital Ltd.*,
499 F. Supp. 2d 117 (D.Conn. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Meyer Pincus & Assoc, P.C. v. Oppenheimer & Co.*,
936 F.2d 759 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*,
523 F.3d 75 (1st Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Mizzaro v. Home Depot, Inc.*,
544 F.3d 1230 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Nami v. Fauver*,
82 F.3d 63 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*New York v. Panex Indus., Inc.*,
1997 U.S. Dist. LEXIS 3163 (W.D.N.Y. Mar. 14, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Novinger Group, Inc. v. Hartford Ins., Inc.*,
2007 U.S. Dist. LEXIS 35779 (E.D. Pa. May 16, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Oran v. Stafford*,
226 F.3d 275 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron, Inc.*,
741 F. Supp. 2d 474 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Plumbers and Pipefitters Local Union v. Zimmer*,
673 F. Supp. 2d 718 (S.D. Ind., Dec. 1, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Prime Building Corp. v. Itron, Inc.*,
22 F. Supp. 2d 440 (E.D. Pa. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Pryor v. Nat'l Collegiate Athletic Ass'n*,
   288 F.3d 548 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*RMED Int'l Inc. v. Sloan's Supermarkets, Inc.*,
   185 F. Supp. 2d 389 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Rahman v. Kid Brands, Inc.*,
   736 F.3d 237 (3d Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 46

*Rand v. Cullinet Software*,
   2004 U.S. Dist. LEXIS 8167 (D. Mass. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Ravens v. Republic N.Y. Corp.*
   2002 U.S. Dist. LEXIS 12162 (E.D. Pa. April 24, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Register v. PNC Fin. Servs. Group, Inc.*,
   477 F.3d 56 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ruggles v. Wellpoint, Inc.*,
   2009 U.S. Dist. LEXIS 99548 (N.D.N.Y. Oct. 14, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Saddle Rock Partners, Ltd. v. Hiatt*,
   1996 U.S. Dist. LEXIS 20649 (W.D. Tenn. March 26, 1996) . . . . . . . . . . . . . . . . . . . . . . . 14

*Saxholm AS v. Dynal, Inc.*,
   938 F. Supp. 120 (E.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

*Semerenko v. Cendant Corp.*,
   223 F.3d 165 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*South Ferry LP v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*TSC Indus. Inc. v. Northway, Inc.*,
   426 U.S. 438 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Teachers' Ret. Sys. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Tellabs v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 68

*Turner v. magicJack VocalTec, Ltd.*,
    2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68, 69

*United Paperworkers Intern. Union v. Int'l Paper Co.*,
    985 F.2d 1190 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Varghese v. China Shenghuo Pharm. Holdings*,
    672 F. Supp. 2d 596 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Weinstein v. Eisenberg*,
    474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Wielgos v. Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Wilson v. Bernstock*,
    195 F.Supp. 2d 619 (D.N.J. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Winer Family Trust v. Queen*,
    503 F.3d 319 (3d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Yamrus v. Twp. of Wash.*,
    2009 U.S. Dist. LEXIS 43255 (E.D. Pa. May 20, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Zucco Partners, LLC v. Digimarc Corp.*,
    2009 WL 311070 (9th Cir. Feb. 10, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

## STATUTES

Fed.R.Civ.P. 9(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Fed.R.Civ.P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Section 10(b) of the Exchange Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Section 78u-4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

21 U.S.C. § 321(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

## OTHER AUTHORITIES

Bens, Nagar, Skinner and Wong,
  *Employee Stock Options, EPS Dilution and Stock Repurchases*, 36 Journal of Accounting and
Economics at No. 1-3 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Bonaimé and Ryngaert,
  *Insider trading and share repurchases: Do insiders and firms trade in the same direction?* . . 57

Chen,
  *The Informational Role of Short Sellers –the Evidence from Short Sellers' Reports,* Department
of Accounting, the London School of Economics and Political Science . . . . . . . . . . . . . . . . . . 56

Maxwell Murphy,
  *The Pros and Cons of Stock Buybacks* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Sarbanes-Oxley Act of 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Section 510(k) of the Food, Drug and Cosmetic Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Voss,
  *Major Themes in Economics* at 55-74 (Spring 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Xie and Boush,
  *How susceptible are consumers to deceptive advertising claims? A retrospective look at the
experimental research literature*, The Marketing Review, Vol. 11, No. 3 at 293-314 (2011) . . . 7

# I.    INTRODUCTION AND PRELIMINARY STATEMENT

The Amended Complaint ("Complaint") of Lead Plaintiff states clear, straightforward, highly plausible and legally cognizable claims for securities fraud.  Defendants assert that they accept as true the averments of the Complaint because they are required to do so at this procedural stage, but then do exactly the opposite.  Indeed, in their Memorandum of Law in Support of their Motion to Dismiss ("Defs' Mem." or "Motion to Dismiss" or "Motion"), Defendants consistently contest the facts pled in the Complaint, seek to mischaracterize those facts that are unhelpful or otherwise ignore them.  That approach is neither appropriate nor persuasive.

The remainder of Defendants' Motion to Dismiss, which is essentially based upon a "truth on the market" defense that is not amenable to adjudication at the motion to dismiss stage, argues that information regarding the lack of efficacy of the flagship product of PhotoMedex, Inc. ("PhotoMedex" or "Company") and problems in its key Japanese market were publically known and understood by the market.  But the Complaint pleads otherwise.  Indeed, as detailed below, information that the Company's flagship product does not permanently eliminate hair or reduce the rate of hair re-growth, and that sales in the critical Japanese market was collapsing, was not widely disseminated and known (if at all), and, throughout the Class Period, Defendants made contrary, positive statements that influenced the "mix of information" available to the market.  Rather than acknowledging this reality, however, Defendants attempt to recast their "truth on the market" defense as something other than what it is (e.g., contesting whether the Complaint adequately pleads the falsity of the statements at issue and loss causation by using "truth on the market" as the primary basis for those arguments).  When viewed in proper context,

Defendants' Motion should largely be read as a "truth on the market" defense masquerading as some other defenses.[1]  That effort should not be permitted to stand.  The remainder of Defendants' Motion is based upon arguments (e.g., claiming that the alleged false statements all amount to puffery, are forward looking and are protected by a statutory "safe harbor," and that the Complaint fails to adequately plead scienter), which lack substantive merit and, again, would require the Court to accept Defendants' "facts" as true and read the Complaint in a light most favorable to Defendants.

The well-pled facts establish that, in essence, PhotoMedex's core product is "snake oil," that Defendants consistently misrepresented the efficacy of its core product to the investing public and Defendants have known that the core product does not work as represented since before the Class Period.  Although Defendants attempt to cabin Lead Plaintiff's efficacy claims regarding the no!no! hair removal device ("no!no! device") as relating solely to the performance of no!no! device, when compared to laser treatments, there is nothing in the Complaint to support that limitation.  Rather, as the Complaint makes clear, the core efficacy allegation in this case is that, contrary to Defendants' specific claims to investors throughout the Class Period, use of the supposedly "revolutionary" no!no! device does not result in any "long-term" or "permanent" reduction of hair, a reduction in the rate of hair re-growth, or work as well as laser hair removal or other similar products.  ¶ 32.[2]

---

[1]That is why the words "truth on the market defense" never appear in Defs' Mem. -- even though that is what their brief is all about.

[2]Citations to "¶__" refer to the numbered paragraphs of the Complaint.  Despite Defendants' self-serving attempt to recast Lead Plaintiff's Complaint, in Class Period statements to investors, Defendants made a number of specific, false statements to investors.  For example, investors were told as follows:

The well-pled facts also establish that, despite consistently positive statements about the Company's performance and prospects based on *current* sales levels in Japan (the Company's second biggest market), throughout the Class Period, Defendants knew (or recklessly disregarded the fact) that sales in Japan were flagging and PhotoMedex's sole distributor in Japan was financially troubled. That is why, at the end of the Class Period in November, 2013, investors learned *for the very first time* that PhotoMedex had $43 million worth of inventory sitting on that distributor's shelves -- *an amount equal to the amount of all of the product that*

---

The no!no! device works "by instantly removing hair and *reducing the rate of hair regrowth* with no pain, no mess and no chemicals." ¶ 48.

The no!no! device, "enable[s] longer-lasting hair removal" and the no!no! hair removal device is "designed to reduce hair growth." ¶ 52.

The no!no! device is "the answer to ever-growing demand for professional, pain-free *long-lasting hair removal* that can be performed in the comfort and convenience of the home" that "[t]his revolutionary product innovation offers a solution to unwanted hair of all types and colors by instantly removing hair and *reducing the rate of hair regrowth with no pain, no mess and no chemicals.*" ¶ 60.

*See also* ¶ 5 ("PhotoMedex represents to investors that the no!no! device has several technical 'competitive advantages' over other hair removal products/processes such as shavers, waxing, threading, and laser-based and intense light-based products . . . . [and] unbeknownst to investors, the no!no! device is no better or more effective at removing hair than a shaver, though it is significantly more expensive than a razor, with some models priced at approximately $270 per unit and others more than $300 per unit for retail.) As also detailed in the Complaint, while Defendants made positive statements regarding their operations and sales of the no!no! device throughout the Class Period, they neglected to tell investors (and omitted the critical, material fact) that PhotoMedex's flagship product simply does not work as represented. ¶¶ 50, 52, 55, 57, 62, 64, 68, 70, 72, 74. But, at the close of the Class Period, investors learned that using the no!no! device was no more effective at long-term hair removal or reduction than shaving. ¶ 33. And, despite Defendants' desperate attempt to rely upon the study of Dr. James M. Spencer from 2007 (*see* Defs' Mem. at Ex. 16), Dr. Spencer's study (funded by Radiancy) of 20 subjects (eight of whom dropped out of the study) did no "measurement of regrowth of hair" and made no findings as to eliminating hair, long-lasting hair removal or reducing the rate of hair regrowth. And, of course, all of these questions implicate factual questions that are not amenable to resolution upon a motion to dismiss.

***PhotoMedex had shipped to Japan in calendar year 2013***. Defendants never respond or squarely deal with this damning fact, presumably because they have no answer for it.

In essence, Defendants would have the Court believe that, notwithstanding repeated contrary statements by Defendants to the marketplace, investors knew that PhotoMedex's flagship product did not work as represented and that the Company's Japanese distributor and sales were in severe trouble. ***Nonsense***. As explained below, Defendants consistently influenced the mix of information in the market through their misstatements and material omissions and thereby artificially inflated the price of PhotoMedex stock[3] while Individual Defendants, Dolev Rafaeli ("Rafaeli") and Dennis M. McGrath ("McGrath")(collectively, the "Individual Defendants"), engaged in a massive sell-off of their stock holdings in the Company. In sum, the Complaint pleads a classic case of securities fraud. Lead Plaintiff respectfully submits that it should be provided with an opportunity to prove its case.

---

[3]Defendants appear to operate under (or promote) the misconception that, if information was publically available or discoverable, that automatically means that such information has the same impact upon a stock's price as Defendants' active, public pronouncements regarding the same subject matter. For example, Defendants apparently would argue that, because an investor might be able to glean that the Company's Japanese distributor was in general financial trouble if it pored over the financials of the distributor in Japanese, investors and the market should not have relied upon Defendants' contrary and false statements regarding its actual Japanese sales and the performance of the distributor vis-a-vis PhotoMedex and its core product. Under Defendants' construct, investors and the market cannot rely upon the public statements and filings of companies but, instead, must examine and analyze every counter-party doing business with such companies to determine whether they can accept those public statements as truthful. As explained below, there is no support in applicable case law for that proposition. Rather, as discussed below, Defendants urge a misreading and misapplication of the fraud-on-the-market presumption -- that is over-broad, simplistic and unsupportable.

## II.    <u>SUMMARY OF FACTS</u>

PhotoMedex, currently headquartered in Horsham, Pennsylvania, describes itself as a "leader in the dermatology market, committed to the Science of Skin Health in disease management and skin rejuvenation," http://www.photomedex.com/company/purpose.htm, with the purpose "to provide branded dermatological solutions of superior value to improve patients' lives now and into the future." ¶ 2.  To that end, the Company supplies proprietary products and services that address skin diseases and conditions including psoriasis, vitiligo, acne, actinic keratosis, and photodamage.  *Id*.  The Company's flagship product, however, which generates most of the Company's revenues, is the no!no! device, described in more detail below.  *Id*.

In its current form, PhotoMedex is the result of a December 2011 "reverse merger" with Radiancy, a formerly privately-held developer and manufacturer of home-use and professional aesthetic and dermatological devices headquartered in Orangeburg, New York, with significant operations in the State of Israel.  ¶ 3.  Radiancy marketed and sold a range of home-use devices under its proprietary brand, no!no!®, for various indications, including hair removal, acne treatment, skin rejuvenation, and facial muscle toning, which PhotoMedex now markets and sells as a result of the merger.  ¶ 4.  Prior to the reverse merger, Radiancy's chief product was the no!no! device.  *Id*.  Under the terms of the merger, Radiancy's President and Chief Executive Officer ("CEO"), Rafaeli, became the CEO of the new PhotoMedex, while PhotoMedex's previous President and CEO, McGrath, assumed the position of President and Chief Financial Officer ("CFO") of the new PhotoMedex.  *Id*.[4]

_____

[4]The reverse merger between PhotoMedex and Radiancy was a "marriage of convenience" that provided Radiancy with a way to obtain access to the U.S. capital markets as a public company without going through the extensive, highly regulated process of pursuing an

After the reverse merger, Radiancy's no!no! device became the new flagship product for PhotoMedex, and the Company's main revenue and profit driver. ¶ 5. According to one of the advertising websites operated by Radiancy (which, following the reverse merger, became a wholly-owned subsidiary of PhotoMedex), the no!no! device works through direct application of the device to the skin, whereupon the device transmits heat to the hair and removes it (http://www.trynono.com/how-nono-hair-works/). *Id.* From the time of the December 2011 reverse merger and even continuing today, PhotoMedex represented to investors that the no!no! device has several technical "competitive advantages" over other hair removal products/processes such as shavers, waxing, threading, and laser-based and intense pulsed, light-based products. *Id.* In fact and unbeknownst to investors, the no!no! device is no better or more effective at removing hair or reducing hair regrowth than a shaver, though it is significantly more expensive than a razor, with some models priced at approximately $270 per unit and others more than $300 per unit for retail. *Id.* Essentially, PhotoMedex's business model of generating revenue from the no!no! device relies on a massive false advertising campaign, which misinforms and cajoles consumers into purchasing a novelty product that reliable scientific studies establish is lacking in efficacy. *Id.* As explained below, the Company and Individual Defendants are well aware that the no!no! device lacks efficacy and is no more effective than a razor. *Id.*[5] Nevertheless, Defendants persist in an aggressive campaign to falsely advertise the

---

initial public offering ("IPO"), and provided PhotoMedex with the opportunity to access Radiancy's funds to assist in developing the Company's struggling legacy product line. ¶¶ 23-28.

[5]Defendants' effort to limit the Complaint's efficacy claims to comparing the no!no! device to laser treatments flies in the face of the actual averments of the Complaint. For example, while Defendants claim that Confidential Witness Three ("CW3") only provided

supposed benefits of PhotoMedex's flagship product -- the no!no! device.  *Id*.

In recognition of the flawed nature of the no!no! device, in 2013, PhotoMedex was forced to spend significantly more on advertising in the United States than in 2012 to generate significantly less sales in 2013 when compared to 2012,[6] while the Company's sales in its second biggest market, Japan, literally collapsed in 2013.  *Id*. at ¶ 7.  Furthermore, throughout the Class Period, Defendants were on notice and aware that the Company's exclusive distributor in its second biggest market, Japan, was experiencing significant financial problems and that sales of the no!no! device in Japan were flagging, as Defendants had both specific information regarding the tens of millions of dollars in products (principally, the no!no! device) which had been shipped by PhotoMedex to that distributor and booked as sales, and information regarding the

---

information regarding the lack of efficacy of the no!no! device, as compared to lasers, the actual information supplied by CW3 was that the no!no! device was completely ineffective in permanently eliminating hair or reducing the rate of hair regrowth.  ¶¶ 92-93.

[6]In its annual report for 2013 filed as Form 10-K with the SEC in March 2014, the Company disclosed that net revenues have decreased from $136 million in 2012 to $113 million in 2013 in the United States, or more than 15%, notwithstanding the Company's total increased consumer marketing and selling expenditures from $102.7 million in 2012 to $161.4 million in 2013.  ¶ 89.  As the Complaint explains, the Company's sale of the no!no! device is essentially dependent upon PhotoMedex engaging in a false and misleading marketing campaign to consumers about the efficacy of its flagship product.  ¶ 6.  As the Complaint also explains, the risk for PhotoMedex is that, if the mix of information in a consumer market reaches a tipping point in which consumers realize that the no!no! device is no more effective than a razor in either permanently eliminating hair or reducing hair regrowth, but is much more expensive, then the market ultimately will react and sales will diminish and/or collapse.  *Id*.  Defendants attack these averments on the basis that they are somehow unsupported and implausible.  Not correct.  First, there is nothing improper about using common sense in pleading a Complaint.  Second, empirical research in the field of marketing unsurprisingly supports the averments in that paragraph.  *See* Xie and Boush, *How susceptible are consumers to deceptive advertising claims? A retrospective look at the experimental research literature*, The Marketing Review, Vol. 11, No. 3 at 293-314 (2011).  Of course, Lead Plaintiff's averments also are consistent with the fact that the Company is being forced to spend more on consumer marketing and selling expenditures to generate less net revenues, as detailed above.

actual amount of sales to consumers in Japan. *Id*. Throughout the Class Period, Defendants concealed this material information while continuing to make positive (but false and misleading) statements regarding the Company's prospects in Japan. *Id*.

As described in more detail below, prior to and during the pendency of the reverse merger, Radiancy was sued for falsely advertising the efficacy of the no!no! device by a competitor, and ultimately was forced to change its consumer advertising regarding its flagship product as a result of this litigation. ¶ 8.[7] Nevertheless, the Company continued to tout the efficacy and "competitive advantages" of the no!no! device to investors -- using representations that it withdrew from its consumer advertising as a result of the competitor's lawsuit, but which it continued to use in trumpeting PhotoMedex's products and prospects to investors. *Id*. Significantly, despite the fact that the confidential terms of the settlement amounted to an admission that PhotoMedex's flagship product lacks efficacy, the Company and its officers explicitly denied that the lawsuit and the settlement of that lawsuit had or would have any material impact on the Company's business. *Id*.

Investors first received meaningful and well-publicized notice in October 2013 of the

---

[7]This lawsuit also gave rise to a clinical study, initially commissioned by the competitor for litigation purposes, but later published by a peer-review journal in June 2013 (but not well publicized), concluding that the device was no more effective at removing hair than a razor or reducing hair growth. *Id*. As discussed below, the fact that this clinical study was published before the Class Period is of little moment where, as here, Defendants continued to make false claims regarding the efficacy of the no!no! device in their public filings and statements, and affirmatively stated that settlement of the *Tria* Litigation would have no material impact on the Company's earnings, thereby significantly impacting the "mix" of information available to the investing public regarding the actual efficacy of its core device. Furthermore, as discussed below, any reliance upon such information (which was not well publicized) amounts to a "truth on the market defense," which plainly cannot be utilized in the context of a motion under Fed.R.Civ.P. 12(b)(6).

June 2013 study, which was critical of the performance of the no!no! device, as compared to the representations regarding the performance of this product, when Streetsweeper.org, an investor blog and short seller, issued a report. ¶ 9. The report, *inter alia*, compared the June 2013 study to the studies cited by PhotoMedex with the assistance of a neutral and objective expert, who is a dermatologist and a professor at the University of Colorado. *Id*. The comparison revealed that, in contrast to the June 2013 critical study, the studies cited by PhotoMedex were either not scientifically rigorous or the results were not as significant or supportive as PhotoMedex had represented to consumers. *Id*. The Streetsweeper.org report also predicted that the Company's fortunes in Japan were at risk and those words soon proved prophetic. *Id*.

On November 6, 2013, the Company issued a press release reporting its financial results for the third quarter of 2013, announcing that its revenues had declined 19.0%, primarily because there were almost no sales of the Company's no!no! device to the Japanese market. ¶ 10. Japan was a critical market for the no!no! device, representing 20% of the Company's revenues for 2011. *Id*. Throughout the Class Period, the Company frequently touted its prospects for expansion, as well as the enduring popularity, of the no!no! device in Japan and actively misled investors regarding PhotoMedex's prospects in Japan. *Id*. At the time of the November 6, 2013 press release, the Company blamed the revenue loss to a re-organization by its distributor, which Rafaeli explained on a same-day earnings call was a result of the distributor's plan to eliminate the middlemen that existed between the distributor and retailers. ¶ 11. On the same call, Rafaeli revealed that at least 160,000 units worth at least $43 million at retail prices, and amounting to approximately 5% of the Company's gross annual revenues, approximately 15% of the amount of sales that PhotoMedex had booked as sales/revenue in Japan over the previous four years, and

over 50% of the amount of sales that reasonably could have been anticipated by the Company to the Japanese distributor in 2013, were actually in the hands of the distributor. *Id*. Since Defendants touted the Company's ability to track actual sales to consumers in Japan through a market research firm, which, *inter alia*, tracked scanned bar codes at retailers, Defendants clearly were aware of the true state of affairs in the Japanese market throughout the Class Period. *Id*. Despite claims by PhotoMedex in November, 2013 that sales in Japan remained stable, as explained below, the Company's numbers simply do not add up. *Id*. Later, in December 2013, the Company revealed that its agreement with the Japanese distributor had been terminated, allegedly because of disputes over marketing expenses and the distributor's failure to meet its minimum purchase obligations. *Id*. Despite the purported popularity of the no!no! device in Japan, no replacement distributor had been found as of March 2014. *Id*.

On November 14, 2013, Streetsweeper.org issued another report on PhotoMedex, which, among other things, pointed out that the Company's Japanese distributor had been experiencing financial problems since at least as early as 2013. ¶ 12. The Japanese distributor, a public company in Japan, had seen its revenue tumble and its net income slip by more than two-thirds, as compared to the previous year. *Id*. The Company's executives knew about or, at the very minimum, severely and recklessly disregarded and failed to disclose the problems with its sole distributor in Japan long before the report by Streetsweeper.org and the disclosure of severe issues in Japan on November 6, 2013. *Id*. As a result of these revelations, common shares of PhotoMedex dropped by more than 17%, costing stockholders, including Lead Plaintiff, tens of millions in lost shareholder value. ¶ 13.

Lead Plaintiff asserts claims under the Exchange Act against the Company and the Individual Defendants arising out of misrepresentations and/or omissions of material facts regarding: (i) the effectiveness of the Company's key product, the no!no! device, which rested on flimsy and weak, non-scientific studies; (ii) the existence of a more credible study raising serious doubts as to the touted effectiveness of the Company's key product, which, in fact, showed that the product works no better than shaving; and (iii) the Company's actual performance and prospects for success in Japan, given the flawed nature of its flagship product and critical problems with its sole Japanese distributor. *Id.*

## III.   SUMMARY OF ARGUMENT

The vast majority of Defendants' Motion to Dismiss rests upon arguments that are inappropriate at this state of the litigation.  A motion under Fed.R.Civ.P. 12(b)(6) is not a vehicle to resolve factual disputes.  Simply put, a defendant may not obtain dismissal by contesting the allegations of the Complaint and seeking to have the Court adopt its own version of the facts by requesting that the Court view the facts pled in the Complaint (as well as Defendants' own interpretation of the same) in a light most favorable to Defendants.  *See, e.g., Jackson v. Rohm & Haas Co.*, No. 06-3682, 2007 U.S. Dist. LEXIS 71858, at *4 (E.D. Pa. Sept. 26, 2007) (deciding issue of fact inappropriate for motion to dismiss); *Freedom Med., Inc. v. Gillespie*, 634 F.Supp.2d 490, 518-19 (E.D. Pa. 2007) (same); *Novinger Group, Inc. v. Hartford Ins., Inc.*, 514 F.Supp.2d 662, 672 (M.D. Pa. 2007) (same).  "'[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true.'"  *Frater v. Hemispherx Biopharma, Inc.,* No. 2:12–cv–07152–WY, 2014 WL 272027, at *7 (E.D. Pa. Jan.

24, 2014)("*Hemispherx*"), quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Here, by asserting numerous defenses that courts regularly find are premature at the motion to dismiss phase, Defendants have inevitably created questions of fact, which require denial of their Motion.

Defendants set forth their version of the "facts" throughout their Motion to Dismiss -- even though those "facts" are specifically contradicted by the allegations of the Complaint. Specifically, many of Defendants' facts directly contradict facts pled in the Complaint and, therefore, cannot be considered at this procedural stage. For example, Defendants somewhat strangely argue that their public statements that the no!no! device permanently eliminated and/or reduced the re-growth of hair is in no way contradictory with the truth that the no!no! device is no more effective than a razor. *See* Defs' Mem. at 15. But how could that factual assertion by Defendants be correct or even logical? Do Defendants truly believe that razors either permanently eliminate hair or reduce the rate of re-growth of hair? Obviously, putting aside common experience, the Complaint, taken as a whole, plainly pleads otherwise. And, resolution of such factual disputes are not appropriate at the motion to dismiss stage. Likewise, Defendants' blunderbuss that the Complaint's factual pleading that the *Tria* Settlement resulted in PhotoMedex eliminating certain claims from its consumer advertising (while maintaining the same claims in its public pronouncements to investors) is somehow "rank speculation," fails in the face of the actual, detailed and logical averments of the Complaint. ¶¶ 8, 36-38, 42. And, once again, requesting that the Court resolve such factual disputes at this procedural stage is, in a word, inappropriate. *See Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1995) (reversing dismissal of claim because lower court "chos[e] to believe" contentions set forth in defendant's affidavit,

thereby "fail[ing] to take the allegations in the complaint as true – as it must in considering a

motion to dismiss under Rule 12(b)(6)"); *Yamrus v. Twp. of Wash.*, No. 08-2842, 2009 U.S. Dist.

LEXIS 43255, at *7 (E.D. Pa. May 20, 2009) (holding that "[w]hile defendants' motion to

dismiss disputes . . . facts, such factual disputes are matters for juries to decide.")[8]

The bulk of Defendants' legal challenges to Plaintiffs' allegations of false and misleading

statements amount to a "truth-on-the-market" defense, which is improperly raised at this stage of

the litigation. What the market knew and whether investors were deceived by Defendants'

statements are factual issues. For example, Defendants contend that information regarding the

lack of efficacy of the no!no! device was in the public domain and information regarding the

financial performance of the Company's Japanese distributor was a matter of public record

(albeit in Japanese). *See* Defs' Mem. at 25-26. Of course, Defendants neglect to mention that

they made repeated and contradictory statements regarding the efficacy of the no!no! device, the

Japanese distributor and the status of operations in Japan throughout the Class Period. In arguing

that the Complaint does not plead material omissions and misstatements, Defendants also dispute

the falsity of the alleged statements (even though the Complaint plainly and specifically explains

---

[8]Defendants also appear to rely upon the Individual Defendants' post-Class Period statements in an effort to explain away the enormous issues in Japan as a basis to support dismissal of the Complaint. *See* Defs' Mem. at 28 (Defendants' explanation that failure in Japan was caused by change in distributor's "business model"). But those explanations are contradicted by the averments of the Complaint. ¶¶ 7, 11, 46, 83, 86. And, witness credibility determinations are reserved for the fact-finder, and are not considered appropriate for a summary judgment motion, much less for a motion to dismiss. *Prime Building Corp. v. Itron, Inc.*, 22 F. Supp. 2d 440, 445 (E.D. Pa. 1998) (holding that credibility disputes are "not appropriately resolved at the summary judgment stage"); *Gerber v. Moisel*, Civ. A. No. 02-7650, 2003 U.S. Dist. LEXIS 20797, at *7 (E.D. Pa. Nov. 13, 2003)(holding that "[i]t should be left to the trier of fact to weigh the credibility of each witness and to determine whose version of the events to credit.").

why they were false).  Defs' Mem. at 18-19.  Those arguments, which almost entirely are reliant

upon Defendants disputing the Complaint's facts and reading the Complaint in a light most

favorable to them, are of little moment.

Defendants' truth-on-the-market defense must be rejected because they face a "heavy

burden of proof" to show that "no rational jury could find that the market was misled."  *See*

*Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996).  Furthermore, they are not permitted

to assert the truth-on-the-market defense at the motion to dismiss phase because such an inquiry

is highly fact-intensive and, therefore, only appropriate for a fact-finder.  *Basic v. Levison*, 485

U.S. 224, 249, n.29 (1988); *Saddle Rock Partners, Ltd. v. Hiatt*, No. 95-2326-GA, 1996 U.S.

Dist. LEXIS 20649, at * 52-53 (W.D. Tenn. Mar. 26, 1996).[9]

---

[9]Defendants' truth-on-the-market defense fails for at least two additional reasons.  First as explained more fully below, they have not come close to showing that the so-called public information they cite "effectively counterbalanced" their false and misleading statements.  *See Saddle Rock Partners, Ltd.*, No. 95-cv-2326-GA, 1996 U.S. Dist. LEXIS 20649, at *53; *DeMarco v. Robertson Stephens Inc.*, 318 F. Supp. 2d 110, 121 (S.D.N.Y. 2004).  *Second,* the entire premise of the truth-on-the-market doctrine is that "the market has become aware of the allegedly concealed information," and therefore "the facts allegedly omitted by the defendant would ***already be reflected in the stock's price.***"  *Provenz*, 102 F.3d at 1492 (emphasis added); *see also Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 516 (7th Cir. 1989) ("Prompt incorporation of news into stock price is the foundation for the fraud-on-the-market doctrine and therefore supports a truth-on-the-market doctrine as well.").  In this case, Defendants cannot seriously assert that the information concerning the efficacy of the no!no! device or the issues in the Japanese market were known by the market throughout the Class Period.  When those reasons were revealed, the price of PhotoModex's stock declined by  21.8% from October 17, 2013 to November 6, 2013.  ¶¶ 110-112.  The materiality of information may be evidenced by movement in a company's stock price following disclosure.  *See In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 544 (D.N.J. 2002)(citation and internal quotation marks omitted)("when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following the disclosure, of the price of the firm's stock"); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) ("In the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock.").

Defendants also argue that certain of the misstatements were mere "puffery," (Defs' Mem. at 19), *i.e.*, that the misstatements were immaterial. *See EP Medsystems, Inc. v. Echocath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (contrasting "[m]aterial representations" with statements of puffery). Like the truth-on-the-market defense, questions as to materiality are generally not decided on a Rule 12(b)(6) motion, but instead "require[] delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1975); *see also RMED Int'l Inc. v. Sloan's Supermarkets, Inc.*, 185 F. Supp. 2d 389, 400 (S.D.N.Y. 2002) (observing the Supreme Court's belief that "materiality is particularly well suited for jury determination"); *Feiner v. SS & C Techs.*, 11 F. Supp. 2d 204, 207-08 (D. Conn. 1998) (refusing to dismiss claim because alleged misstatements and omissions could not be determined immaterial as a matter of law, and noting that "it is unlikely that a cause of action which requires a determination of materiality can be dismissed as a matter of law"). More importantly, Defendants have taken the statements they challenge as puffery out of context. As discussed in detail in below, these statements, when fairly considered in context, are material, non-puffery.

Defendants also argue that their misstatements were forward-looking, and are therefore entitled to the safe harbor protections of the PSLRA. In order to qualify for such protection, however, Defendants must demonstrate that their statements are, in fact, forward-looking, and if so, are accompanied by "meaningful cautionary language," a determination that is seldom resolved at the motion to dismiss phase. *See In re Lucent*, 217 F. Supp. 2d at 557 (holding that the question of whether purportedly "cautionary language" identified by Defendants is

"sufficiently 'meaningful' raises fact issues that are improperly resolved" at the motion to dismiss phase).

Finally, the Complaint contains abundant allegations that support a strong inference that Defendants acted with scienter. Defendants' arguments to the contrary result from a convenient misreading of the Complaint's scienter allegations, as well as applicable law. Having sufficiently alleged Defendants' scienter, pursuant to the Supreme Court's guidance in *Tellabs*, 551 U.S. at 322-23, the burden shifts to Defendants to demonstrate that the allegations give rise to an inference of nonculpable conduct that is stronger than the inference of scienter. *Id.* at 324. Defendants, however, offer *no* competing inference, much less a stronger inference, to defeat the inference of scienter, which is supported by numerous allegations described in detail in below.

## IV.   ARGUMENT

### A.   Legal Standard for a Rule 12(b)(6) Motion

A motion to dismiss is defeated where the complaint alleges "enough factual matter (taken as true)" to suggest that a violation occurred, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Therefore, a court's task in resolving a Rule 12(b)(6) motion is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-CV-1014, 2004 U.S. Dist. LEXIS 13255, at *8-9 (E.D. Pa. July 12, 2004); *see also Register v. PNC Fin. Servs. Group, Inc.*, 477 F.3d 56, 61 (3d Cir. 2007)(citation omitted)(on a motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims'"). *Twombly* instructs courts to apply a "plausibility" standard of review under Fed.

R. Civ. P. 12(b)(6). *Id.* at 570.[10]

## B. Standard for Violation of the Exchange Act

A plaintiff states a claim under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by alleging "'a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff's [sic] reliance was the proximate cause of their injury.'" *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 251 (3d Cir. 2009), quoting *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007).

In order to bring a private action pursuant to Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege the following elements: "(1) a *material misrepresentation* (or *omission*); (2) *scienter*, *i.e.*, a wrongful state of mind; (3) a *connection with the purchase or sale of a security*; (4) *reliance*, often referred to . . . as transaction causation; (5) economic loss; and (6) *loss causation*, *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)(citation and internal quotations omitted).

Plaintiffs must satisfy the heightened pleading rules codified in the PSLRA. *Avaya*, 564 F.3d at 252. The PSLRA provides two distinct pleading requirements. First, under 15 U.S.C. §

---

[10]"[I]n a pre-discovery motion to dismiss, 'the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence.'" *Gerber v. Bowditch*, No. 05-10782-DPW, 2006 U.S. Dist. LEXIS 27552, at *25 (D. Mass. May 8, 2006)(citation omitted); *see also Ravens v. Republic N.Y. Corp.,* No. 99-4981, 2002 U.S. Dist. LEXIS 12162, at *22 (E.D. Pa. April 24, 2002) ("The plaintiffs in securities fraud cases are not required to plead all of the evidence and proof thereunder supporting their claims."); *In re Unisys Corp. Sec. Litig.*, No. 99-5333, 2000 U.S. Dist. LEXIS 13500, at *10 (E.D. Pa. Sept. 21, 2000) ("[N]either the Reform Act nor Rule 9(b) requires plaintiffs to plead all of the evidence and proof thereunder supporting their claim.").

78u-4(b)(1), the complaint must "'specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity.'" *Avaya*, 564 F.3d at 252-53, quoting *Winer Family Trust*, 503 F.3d at 326 (discussing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "'with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Avaya*, 564 F.3d at 253, quoting 15 U.S.C. § 78u-4(b)(2). Both provisions require facts to be pleaded "with particularity," and "[t]his ['particularity'] language echoes precisely Fed. R. Civ. P. 9(b)." *Id* at 253, quoting *In re Advanta Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999), *abrogated on other grounds by Avaya*, 564 F.3d at 277 ; *see also* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake.")).

Although the PSLRA replaced Rule 9(b) as the pleading standard governing private securities class actions, *see Tellabs*, 551 U.S. at 319, Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u-4(b)(1) of] the PSLRA." *Avaya*, 564 F.3d at 253, quoting *Miss. Pub. Employees' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 85 n.5 (1st Cir. 2008); *see also Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1165 (9th Cir. 2009) ("[T]he inquiry into whether plaintiffs have pled falsity with the requisite particularity under the PSLRA is nearly identical to that under Federal Rule of Civil Procedure 9(b)....")). This standard "requires plaintiffs to plead the who, what, when, where and how; the first paragraph of any newspaper story." *Avaya*, 564 F.3d at 253, quoting *In re Advanta*, 180 F.3d at 534 (internal quotation marks omitted). Section 78u-4(b)(1) adds an additional requirement where "'an allegation regarding [a defendant's] statement or omission is made on information

and belief.'" *Id.*, quoting 15 U.S.C. § 78u-4(b)(1)(B).  In those circumstances, plaintiffs must

also "state with particularity all facts on which that belief is formed."  *Id.*, quoting *Advanta*, 180

F.3d at 538.  Thus, when allegations are made on information and belief, the complaint "must

state the allegations with factual  particularity," and also "describe the sources of information

with particularity, providing the who, what, when, where and how of the sources, as well as the

who, what, when, where and how of the information those sources convey."  *Id*.

As discussed below, Lead Plaintiff's allegations of the falsity of Defendants' statements

comply with the PSLRA's pleading requirements.  The Complaint methodically lists the various

statements at issue and specified which Defendant made each one.  *See* ¶¶ 48, 50, 52, 55, 57, 60,

62, 64, 66, 68, 70, 72, 74.  Lead Plaintiff also describes the exact reasons each statement is false

and plead that such misstatements are material.  ¶¶ 49, 51, 54, 56, 58, 61, 63, 67, 69, 71, 73, 75,

77.  *See also In re RAIT Fin. Trust Sec. Litig.*, No. 2:07-cv-03148-LDD, 2008 U.S. Dist. LEXIS

103549, at *52-55 (E.D. Pa. Dec. 22, 2008).

      **C.**      **The Complaint Sufficiently Alleges False and Misleading Statements**

In regular press releases, conference calls and filings with the SEC through the Class

Period, PhotoMedex and the Individual Defendants repeatedly made false and misleading

statements and/or failed to disclose material, adverse facts concerning the state and expectation

of PhotoMedex's growth, operations, business prospects and finances, as well as the

effectiveness of its no!no! device, thereby propping up the share price at artificial levels

throughout the Class Period.

### 1. Defendants' Material Misstatements And Omissions About The No!No! Device

On November 6, 2012, before the market opened and immediately before the start of the Class Period, in a press release promoting the success of a TV home shopping event marketing the no!no! device, PhotoMedex made a number of false and misleading statements describing the no!no! device as a "revolutionary product innovation [that] offers a solution to unwanted hair of all types and colors by instantly removing hair and *reducing the rate of hair regrowth* with no pain, no mess and no chemicals. ***Based on the patented and exclusive Thermicon technology, no!no! uses heat to remove hair and get long-lasting results over time, making it universally safe and effective for everyone***." Complaint at ¶ 48 (emphasis added.) These statements were false and misleading because the Company and the Individual Defendants knew and failed to disclose that the no!no! device was no more effective than a razor in removing hair or reducing hair growth; the Company had specifically agreed to eliminate such false claims from its consumer advertisements as part of the *Tria* Settlement and Rafaeli had known for years, dating back to at least 2009, as explained below, about the no!no! device's lack of efficacy in eliminating hair or reducing the rate of hair re-growth. *Id.* at ¶ 49.[11]

---

[11]Defendants, in essence, improperly contest the truthfulness of these allegations, asserting that the Complaint does not adequately explain why these statements were false. Defs' Mem. at 18. Those arguments are unpersuasive. The Complaint provides detailed information about why, how and when Defendants learned and knew that the core product of the Company did not work as represented. *See, e.g.,* ¶¶ 40-44, 90-97. Defendants' effort to contest the logical inferences drawn from these facts or to describe them as simply arguments regarding "beliefs" is implausible. For example, Defendants' argument that when, before the Class Period, Rafaeli responded to internal complaints that the product did not work by insisting "that the no!no! device be applied to a portion of the manager's leg that was hairless and then insisted that the product had worked, even though it clearly did not and could not have removed any hair from this portion of the manager's leg.... [as] part of a desperate attempt ensure that Radiancy personnel ceased questioning the efficacy of this flagship product and understood that they were

Likewise, in press releases, SEC filings and shareholder updates throughout the Class Period issued and/or filed on November 7, 2012, November 13, 2012, December 17, 2012, January 10, 2013, February 3, 2013, March 13, 2013, March 18, 2013, May 8, 2013, May 10, 2013, August 7, 2013 and August 9, 2013, Defendants trumpeted the efficacy of their core no!no! device and the sales/revenues/profits the Company was deriving from sales of these devices, while concealing the highly material fact that the no!no! device does not work as represented and, instead, is no more effective than a razor:

- In a press release issued by PhotoMedex on November 7, 2012, which quoted Defendant Rafaeli, it was reported to the investing public that the Company had achieved "another quarter of strong financial results with revenues increasing 63% over last year, gross profit increasing 71% and net income increasing 79%" and stating that its no!no! device "once again broke home television shopping sales records in the U.S." *Id*. at ¶ 50.

- In a Form 10-Q filed with the SEC by PhotoMedex on November 13, 2012, and signed by both Defendants, Rafaeli and McGrath, it was reported to the investing public that "Thermicon brand Heat Transfer Technology," the basis of the no!no! device, "enable[s] longer-lasting hair removal" and the no!no! hair removal device is "designed to reduce hair growth." *Id*. at ¶ 52.

- In a Company press release issued on December 17, 2012, which quoted Defendant Rafaeli, PhotoMedex represented that "no!no! hair is the leading women's hair removal device in Japan" and "[w]e expect continued growth of no!no! products there through our finely honed consumer marketing program." *Id*. at ¶ 55.

- In a "Quarterly Update" published to the investing public on January 10, 2013 -- on Crystal Research Associates' masthead (even though the document was

---

required to adopt the Company's deception" somehow supports the view that Rafaeli actually believed in the product (and was not acting as essentially a con man), *see* Defs' Mem. at 31, stretches the bounds of credulity beyond the breaking point. Since Lead Plaintiff does not understand Defendants to be claiming that Rafaeli suffers from delusions, the proffered, alternative explanation by Defendants that Rafaeli's demonstration of the no!no! device on a hairless leg to prove its efficacy supports a finding that Rafaeli did "believe" that the product worked is, to put it kindly, implausible.

prepared by PhotoMedex itself with the assistance of Crystal Research Associates, a purportedly "independent research firm that provides institutional-quality research on small and mid-cap companies" but which did not independently verify any of the information is this ostensible research report) -- the Company represented that "PhotoMedex's competitive advantages include the perceived strength of its technologies as well as its marketing platform," that "PhotoMedex and Radiancy's technologies are clinically supported, hold regulatory clearances, are associated with low costs of goods and high margins, and have large addressable market opportunities," that "the no-no!® Hair home-use products are designed as an alternative to the use of lasers or intense pulsed light (IPL) hair removal treatments" and that "[t]he no-no!® Hair's heat transfer technology ... can be used for all skin color and hair types and is virtually painless"). *Id*. at ¶ 57.

- In a press release issued on February 3, 2013, the Company announced "another successful home shopping television event for its no!no! device," which then went on to describe its no!no! device as "the answer to ever-growing demand for professional, pain-free **long-lasting hair removal** that can be performed in the comfort and convenience of the home," that "[t]his revolutionary product innovation offers a solution to unwanted hair of all types and colors by instantly removing hair and **reducing the rate of hair regrowth with no pain, no mess and no chemicals**" and that "**[b]ased on the patented and exclusive Thermicon technology, no!no! uses heat to remove hair and get long-lasting results over time, making it universally safe and effective for everyone**"). *Id*. at ¶ 60. (Emphasis added.)

- In a press release issued on March 13, 2013, the Company reported its financial and operating results for the fourth quarter and fiscal year ending December 31, 2012, which quoted Defendant Rafaeli extensively and reported strong financial results while crediting PhotoMedex's "consumer engine [meaning its sales of the no!no! device], with our world-class and efficient marketing platform" that the Company asserted were "transportable" to other lines of business. *Id*. at ¶ 62.

- In its 2012 Form 10-K filed with the SEC on March 18, 2013, and signed by Defendants, Rafaeli and McGrath, the Company repeated its previously reported financial results and, with regard to the effectiveness of the no!no! device as compared to other existing hair removal products such as shaving, the Form 10-K stated as follows:

Our no!no!® hair removal products are built upon our proprietary heat-based Thermicon® brand technology to address consumer concerns over perceived limitations of existing hair removal products, including safety and pain, and to overcome inherent limitations of light-based hair removal solutions. Unlike other

products that use methods that are painful, have side effects, are limited in body areas that can be treated or that emanate from the principle of selective thermolysis, the Thermicon® brand devices are based on heat only and are therefore applicable for all hair colors and skin types, can be used on all body areas, and if used per instructions – do not have adverse events, and are virtually painless. Thermicon® brand devices utilize a high-temperature thermodynamic wire filament that is activated when the devices are moved in contact with and across the treatment area. *We believe that the no!no!® brand hair removal products have several advantages over existing products for both the consumer and professional hair removal market, including:*

*Broad Applicability. Where other hair removal products such as shavers, waxing, threading and laser-based and intense pulsed light-based products are either limited by body area treated, are only effective at treating certain hair colors and skin types or are limited by the age of the consumer, products employing the Thermicon® brand devices technology, which do not rely upon light, are virtually painless and without side-effects and are equally effective across all hair colors and all skin types. Therefore, we believe that unlike other hair removal methods (such as shaving, threading and waxing), including light based devices, Thermicon® brand devices effectively remove hair on people with light hair or dark skin.*

\*     \*     \*

*We have realized favorable market adoption of Thermicon® brand technology, which not only overcomes the challenges of other hair removal methods but also puts control of the hair removal process in consumers' hands. Id.* at ¶ 64. (Emphasis added).

- In a press release issued by the Company on May 8, 2013, which quoted Rafaeli extensively, PhotoMedex reported its financial and operating results for the first quarter ending March 31, 2013 and also included the following statement: Dr. Dolev Rafaeli, PhotoMedex CEO, commented, "The rapid growth we have achieved the past few years continued during the first quarter and, importantly, featured an improvement in gross margin led by a 16% increase in consumer revenues, particularly from our no!no!™ products. No!no! is now available in most ever Bed Bath and Beyond store across the U.S. and we are pleased with the initial sales ramp. We have also had strong responses to

our Spanish-language advertisements in the U.S. and our marketing of no!no! Men. *Id*. at ¶ 68.

- In a Form 10-Q filed with the SEC on May 10, 2013, which was signed by both Rafaeli and McGrath, the Company repeated its previously announced quarterly financial results for the period ending March 31, 2013. *Id*. at ¶ 70.

- In a press release issued on August 7, 2013, which quoted Rafaeli, the Company reported its financial and operating results for the second quarter ending June 30, 2013 and continued to trumpet the prospects of the no!no! device: "Dr. Dolev Rafaeli, PhotoMedex CEO, commented, "We are pursuing the next major phase of our growth strategy through expansion of the no!no! brand into Brazil and continued ramp-up in Germany...." *Id*. at ¶ 72.

- In a Form 10-Q filed with the SEC on August 9, 2013, which was signed by both Rafaeli and McGrath, the Company repeated its previously announced quarterly financial results for the period ending June 30, 2013. *Id*. at ¶ 74.

These statements were plainly false and misleading when issued under all of the circumstances because Defendants knew that the Company's core no!no! device did not work as represented. As in the case of *Hemispherx*, "given that Ampligen was Hemispherx's flagship drug, ... I have little doubt that an attentive investor would find those statements and misstatements material." 2014 WL 27027, at *9. Moreover, as in *Hemispherx*, "[t]he conclusion of materiality is further supported by—as instructed by the Third Circuit—looking to the movement of Hemispherx stock when the alleged misrepresentations were revealed." *Id*., citing *In re Burlington Coat Factory*, 114 F.3d 1410 (3d Cir.1997); and *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000). And, "when defendants' various allegedly misleading statements were contradicted ... at the end of the class period, the price of ... stock plummeted [and] [t]his drop subsequent to disclosure strongly suggests that the withheld and/or misrepresented information was material information to investors." *Id*., citing *Oran*, 226 F.3d at 282. Of course, in this case as well, when the truth was revealed to the market, the stock price of PhotoMedex plummeted. ¶¶ 79-85, 104-115. Simply

-24-

put, investors clearly had the right to know that PhotoMedex's core product did not work as consistently represented in its public pronouncements and that the Company's financial health and results were predicated on a product that does not work.[12]

### 2. Defendants' Material Misstatements And Omissions About Its Japanese Operations

Throughout the Class Period, Defendants also made a series of false and misleading statements regarding PhotoMedex's operations and prospects in Japan:

- In its Form 10-Q filed with the SEC on November 13, 2012 for the period ending September 30, 2012, which was signed by Rafaeli and McGrath, the Company stated: With regard to the no!no! brand expansion in Japan, the 3Q 2012 10-Q highlighted the importance of Japan as PhotoMedex's second biggest market for the no!no! device: ***"[e]ven at this level of sales, we believe we have ample opportunity for further expansion, as Japan's 2010 population was over 127 million people and North America's was approximately 400 million people -- far greater than the more than three million who have already purchased our products."*** *Id.* at ¶ 52. (Emphasis added.)

- In a press release issued on December 17, 2012, which quoted Rafaeli, the Company announced a two-year extension of its agreement with the Company's exclusive distributor of the no!no! device in Japan:

  PhotoMedex, Inc. (NASDAQ and TASE: PHMD) announces the signing of a two-year extension with Ya-man, the exclusive distributor of its no!no! brand in Japan. The new agreements calls for minimum order quantities and advertising budgets consistent with the existing agreement, which was due to expire on December 31, 2012. Independent research shows that no!no! hair is the leading women's hair removal device in Japan, accounting for more than 50% of all retail sales.

  Commenting on the renewal of the agreement with Ya-man, Dr. Dolev Rafaeli, chief executive officer of PhotoMedex, said, "Ya-

---

[12]Defendants' attempt to avoid the effect of their consistent pronouncements that the no!no! device permanently eliminated hair or reduced the rate of hair regrowth by obfuscating regarding the actual representations at issue (and the key efficacy question at issue), Defs' Mem. at 17, likewise is unpersuasive.

-25-

man has been a strong distribution partner for the no!no! brand for the past three years and we are delighted to renew the agreement and our partnership, ***which further advances our market-leading position in Japan. We expect continued growth of no!no! products there through our finely honed consumer marketing program and the excellent work Ya-Man is doing, supported by brand extensions into other categories including the no!no! line for men.***" *Id.* at ¶ 55. (Emphasis added.)

- In a January 10, 2013 Quarterly Update published by PhotoMedex with the assistance of Crystal Research Associates, PhotoMedex represented as follows:

  ***In addition, new market data commissioned by Ya-Man Ltd., the Company's Japan distributor, and compiled by GfK Japan in October 2012 found that no-no!® Hair is the leading women's hair removal device in Japan. Based on data collected from retailers for the six months ended March 31, 2012, the Company's no-no!® Hair product accounts for 53% of the cumulative retail value of all women's hair removal devices sold in store in Japan. Importantly, this data is limited to only brick-and-mortar stores and does not include other retail avenues in Japan, such as home shopping, catalog, or direct to consumer, where PhotoMedex has less competition; thus, the Company believes it is possible that its market share in Japan is even higher when all channels are included. Capitalizing on the strength of its consumer marketing in Japan, PhotoMedex has also recently launched its no-no!® line for men.***

  *        *        *

  ***In Japan, no!no!® Hair has reached a 53% market share based on retail sales in brick-and-mortar stores.*** *Id.* at ¶ 57. (Emphasis added.)

- In its Form 10-K filed with the SEC on March 18, 2013 for 2012, which was signed by Rafaeli and McGrath, the Company stated with respect to its Japanese operations as follows: "***[e]ven at this level of sales, we believe we have ample opportunity for further expansion, as Japan's 2012 population was over 127 million people and North America's was approximately 400 million people -- far greater than the more than four million who have already purchased our products***." *Id.* at ¶¶ 64, 66. (Emphasis added.)

- In a press release issued on May 8, 2013, the Company reported its financial and operating results for the first quarter ending March 31, 2013 without disclosing

any issues with its Japanese operations.  *Id*. at ¶ 68.

- In its Form 10-Q filed with the SEC on May 10, 2013 for the period ended March 31, 2013, which was signed by Rafaeli and McGrath, and repeated the Company's previously announced quarterly financial results, the following statement was made with respect to operations and prospects in Japan: "*[e]ven at this level of sales, we believe we have ample opportunity for further expansion, as Japan's 2012 population was over 127 million people and North America's was approximately 400 million people -- far greater than the more than four million who have already purchased our products*."  *Id*. at ¶ 70.  (Emphasis added.)

- In a press release issued on August 7, 2013, the Company reported its financial and operating results for the second quarter ending June 30, 2013 without disclosing any issues with its Japanese operations.  *Id*. at ¶ 72.

- In its Form 10-Q filed with the SEC on August 9, 2013 for the period ended June 30, 2013, which was signed by Rafaeli and McGrath, and repeated the Company's previously announced quarterly financial results, the following statement was made with respect to operations and prospects in Japan: "*[e]ven at this level of sales, we believe we have ample opportunity for further expansion, as Japan's 2012 population was over 127 million people and North America's was approximately 400 million people -- far greater than the more than four million who have already purchased our products*."  *Id*. at ¶ 74.  (Emphasis added.)

As the Complaint explains, the above statements were false and misleading because the Company and the Individual Defendants knew and failed to disclose that: (a) the no!no! device was no more effective than a razor in removing hair or reducing hair growth; (b) the Company had specifically agreed to eliminate such false claims from its consumer advertisements as part of the *Tria* Settlement; (c) Rafaeli had known for years, dating back to at least 2009, as described below, about the no!no! device's lack of efficacy in reducing hair growth or accomplishing longer-lasting hair reduction and, while trumpeting its prospects in other overseas markets; (d) the Company knew or recklessly disregarded and failed to disclose the fact that its sole distributor and key business partner in Japan, Ya-Man, was financially troubled and was experiencing declining revenues and income, having reported, respectively, on September 10,

2012, December 14, 2012, March 14, 2013 and July 26, 2013 (1) a decline of ¥447 million

(approximately $4.47 million) and approximately (8% in total sales and a decline of ¥449

million (approximately $4.49 million) and approximately 52% in ordinary income in the quarter

ending July, 2012 (as compared to the same quarter in 2011), (2) a decline of ¥1.25 billion

(approximately $12.5 million) and approximately 12% in total sales and a decline of ¥722

million (approximately $7.22 million) and approximately 61% in ordinary income in the quarter

ending October, 2012 (as compared to the same quarter in 2011), (3) a decline of ¥1.40 billion

(approximately $14.0 million) and approximately 9% in total sales and a decline of ¥881

million (approximately $8.81 million) and approximately 91% in ordinary income in the quarter ending

January, 2013 (as compared to the same quarter ending in 2012), and (4) a decline of ¥1.06

billion (approximately $10.6 million) and approximately 5% in total sales and a decline of ¥1.27

billion (approximately $12.7 million) and approximately 71% in ordinary income for the fiscal

year period ending April, 2013 (as compared to the prior fiscal year period ending in April,

2012).  In addition, as Rafaeli and McGrath later admitted on a November 6, 2013 conference

call, Ya-Man ceased ordering products from PhotoMedex beginning in the third quarter of 2013.

Moreover, Defendants knew or recklessly disregarded and failed to disclose the fact that sales to

consumers in Japan were significantly flagging and that Japan was becoming, at best, a troubled

market for PhotoMedex.  That is because Ya-Man only purchased approximately $11.5 million in

product from the Company in 2013, as detailed in PhotoMedex's 2013 10-K published after the

Class Period reporting net revenues in Japan, and, as discussed below, at the end of the Class

Period it was discovered that there was over $46 million in unsold Company products

(principally, the no!no! devices) based on retail prices in the Japanese marketplace.  Therefore,

throughout the Class Period and based upon the Company's careful monitoring of consumer

sales at the retail level, PhotoMedex knew, or recklessly disregarded, and failed to disclose the

fact that sales in the Japanese market were dramatically slowing, thereby rendering their Class

Period statements false and misleading when issued.[13]

Defendants' attempt to argue that the Complaint fails to plead sufficient facts that they

were on notice of flagging sales in Japan ignores the actual averments of the Complaint.  In

addition to pleading that its exclusive distributor was experiencing financial problems and

declining sales throughout the Class Period, *see, e.g.,* ¶ 7, Defendants made specific

representations regarding the no!no! device's market share in Japan ¶ 46 (market share in stores

of 53%), ¶ 55 ("i]ndependent research shows that no!no! hair is the leading women's hair

removal device in Japan, accounting for more than 50% of all retail sales"), and ¶ 57 (the

Company's no-no!® Hair product accounts for 53% of the cumulative retail value of all women's

hair removal devices sold in store in Japan), while promoting the relationship with its exclusive

distributor as a tremendous partnership. ¶ 46 ("Ya-Man has been a tremendous distribution

partner for us"), and ¶ 55 ("Ya-man has been a strong distribution partner for the no!no! brand

for the past three years and we are delighted to renew the agreement and our partnership, which

further advances our market-leading position in Japan [and] [w]e expect continued growth of

---

[13]All the Form 10-Qs and the Form 10-K contained signed certifications pursuant to the requirements of the Sarbanes–Oxley Act of 2002 ("SOX") by both Rafaeli and McGrath, stating that the financial information contained in the Form 10-Qs and 10-K was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal controls over financial reporting.  Complaint at ¶ 76.  In light of the adverse information known to the Individual Defendants regarding the Company's core product and the failing operations and sales of PhotoMedex's key Japanese business partner, all of these statements were false and misleading when issued.  *Id.* at ¶ 77.

no!no! products there through our finely honed consumer marketing program and the excellent work Ya-Man is doing, supported by brand extensions into other categories including the no!no! line for men"). Meanwhile, PhotoMedex had the specific ability to closely monitor its sales in Japan (*which occur almost exclusively through retail channels*), including through a market research company, GfK market data, which, as Rafaeli explained on November 6, 2013, monitors and "controls the scanning of products at the cash register" in Japan. ¶ 46. Furthermore, Defendants had both specific information regarding the tens of millions of dollars in products (principally, the no!no! device) which had been shipped by PhotoMedex to that distributor and booked as sales, and information regarding the actual amount of sales to consumers in Japan. ¶ 7. But, at the end of the Class Period, Defendants would have one believe that they suddenly discovered that there were *at least* 160,000 units worth at least $43 million, which is around 20% of the Company's gross annual revenues and over 50% of the amount of sales that PhotoMedex had booked as sales/revenue in Japan and all of the product shipped in 2013, were sitting on the shelves at its distributor -- *with even more in retail channels (which Defendants said they could not quantify)!*. ¶¶ 46, 83, 86, 88. Since Defendants touted the Company's ability to track actual sales to consumers in Japan through a market research firm, which, *inter alia*, tracked scanned bar codes at retailers, it is simply implausible that Defendants were unaware of the true state of affairs in the Japanese market throughout the Class Period. *Id*. Simply put, either Defendants were not being truthful about their ability to track retail sales in Japan or they knew that sales had collapsed in Japan throughout the Class Period.[14] Lead Plaintiff submits that the latter is

---

[14]As the Complaint explains, on November 6, 2013, Rafaeli and McGrath presided over a conference call with research analysts and investors in which they were hammered with questions regarding the situation in Japan and how they could not have known about the significant issues

significantly more plausible.  As in the case of the pleading of falsity and materiality with respect

to the efficacy of the no!no! device, the Complaint is more than sufficient with respect to its

pleading of falsity and materiality in the case of PhotoMedex's Japanese operations.[15]

### 3.     The Pre-Class Period Disclosures Did Not Reveal The Facts That Defendants Concealed From Investors And About Which Defendants Affirmatively Misled Investors

Defendants claim throughout their Motion to Dismiss that their Class Period statements

(and material omissions) were not false and misleading because the facts had been disclosed

before the Class Period.  This contention must be rejected for at least two distinct reasons.  *First*,

as explained above, Defendants' truth-on-the-market defense is inappropriately and prematurely

---

with Ya-Man beforehand, why the Company was continuing to repurchase stock when the exclusive Japanese distributor was no longer purchasing product from PhotoMedex and whether the Individual Defendants would cease their insider sales.  Rafaeli and McGrath only offered unsatisfactory and contradictory explanations for the problems in Japan and never explained how, given the Company's claimed ability to carefully track retail sales (which Rafaeli specifically identified as the primary means in which sales of PhotoMedex's products were accomplished in Japan), PhotoMedex could find itself in the position of having $46 million in Company product on its distributor's shelves with an unspecified amount more in retail channels (which Rafaeli explicitly admitted could not be quantified during the November 6, 2013 call).  ¶¶ 83, 86.

[15]In deciding a motion to dismiss, a court may look to the allegations made in the complaint, any exhibits attached to the complaint and any documents "whose authenticity no party questions and whose contents are alleged in the complaint."  *In re RAIT*, 2008 U.S. Dist. LEXIS 103549, at *14 (citing *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002)).  "Documents attached to a defendant's motion to dismiss may only be considered if they are referred to in the plaintiff's complaint and if they are central to plaintiff's claims."  *Id.* at *14.  For the same reasons, this Court may not consider as true Defendants' statements made in the additional SEC filings that Defendants attach to their Motion to Dismiss.  SEC filings may only be considered "to determine what was said," but not "for their truth."  *In re Vicuron Pharms., Inc. Sec. Litig.*, No. 04-cv-2627, 2005 U.S. Dist. LEXIS 15613, at *7 (E.D. Pa. July 1, 2005).  In this case, although Defendants' attachments (e.g., posting from Amazon.com) are largely inane in light of the issues at hand, Lead Plaintiff respectfully submits that the Court should not credit such "evidence" or presume that statements in SEC filings submitted by Defendants accused of fraud have any weight or significance.

raised in the context of a Rule 12(b)(6) motion. As the Court explained in *Plumbers &*

*Pipefitters Loc. Union No. 630 Pension-Annuity Trust Fund v. Arbitron, Inc.*, 741 F. Supp. 2d

474, 485 (S.D.N.Y. 2010) (emphasis added):

> [T]he defendants argue that the total mix of information available to the reasonable investor included NABOB's criticisms, and that all of the concerns that plaintiffs say were omitted were, in fact, disclosed. These criticisms were reasonably available, defendants argue, because they could be found both in NABOB's press releases and in articles in industry publications. "The 'total mix' of information may . . . include information already in the public domain and facts known or reasonably available to the shareholders," such as information that "***has been widely reported in readily available media***." *United Paperworkers Intern. Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (internal quotations omitted). However, this type of "truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Ganino*, 228 F.3d at 167. ***And even assuming that press releases from an advocacy group and articles in niche publications should be considered part of the total mix (and that the latter are subject to judicial notice), a reasonable jury could find that the defendants' emphatic statements vouching for the PPM overshadowed the concerns raised by outside parties***. *See id.* at 167 ("[C]orrective information must be conveyed to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations." (internal quotation marks omitted)). Accordingly, on the facts before the Court, the voicing of concerns by outside parties was insufficient to keep the alleged statements from being misleading.

Of course, the same exact analysis applies here.[16]  *See also Lawrence E. Jaffe Pension Plan v.*

*Household Int'l, Inc.*, No. 02-cv-5893, 2006 U.S. Dist. LEXIS 83628, at *6-7 (N.D. Ill. Nov. 13,

2006)(addressing the "truth on the market" defense and explaining that "[t]he truthful corrective

information, however, ***must be conveyed to the public with a degree of intensity and credibility***

***sufficient to counter-balance effectively any misleading information created by the alleged***

_____

[16]Defendants' failure to appreciate that the extent to which material information was "widely reported in readily available media" is an important consideration for the ***trier of fact*** in reviewing the total mix of information is fatal to its cause.

*misstatements*'")(citations and internal quotations omitted)(emphasis added); *Rand v. Cullinet Software, Inc.*, 847 F. Supp. 200, 205 (D. Mass. 1994) (same).

Second, the purported disclosures cited by Defendants did not reveal to the investing public the complete facts that Plaintiffs have alleged were concealed. For example, even Defendants do not argue that the complete facts regarding the Company's flagging sales and the enormous amount of inventory sitting on its Japanese distributor's shelves (and in retail channels in Japan) ever was disclosed until after the Class Period.[17]

### D.  Defendants' Arguments That They Had No Duty To Speak And That Their Omissions Are Not Actionable Finds No Support In The Law

As the Complaint establishes, Defendants spoke repeatedly about the efficacy of the no!no! device throughout the Class Period and about their operations in Japan, but persistently omitted facts that would alter the total mix of relevant information for a reasonable investor making an investment decision. "'In order for an omission or misstatement to be actionable. . . , [t]he omission or misstatement must also be material, *i.e.*, something that would alter the total mix of relevant information for a reasonable investor making an investment decision.'" *In re Wilmington Trust Sec. Litig.,* 852 F. Supp. 2d 477, 491 (D. Del. 2012), quoting *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 283 (3d Cir.2010). Here, as explained above, Defendants made consistent statements throughout the Class Period regarding the efficacy of the no!no! device and

---

[17]The cases cited by Defendants to the contrary are easily distinguishable. *See In re FreeMarkets, Inc. Sec. Litig.*, No. 00-024, 2000 WL 33914766, at *7 (W.D. Pa. Dec. 26, 2000) (press release directly disclosed the entirety of the alleged omission); *In re Tseng Labs, Inc. Sec. Litig.*, 954 F. Supp. 1024, 1029 (E.D. Pa. 1996) (summary judgment adjudication); *In re Kulicke & Soffa Indus., Inc. Sec. Litig.*, 697 F. Supp. 183, 186 (E.D. Pa. 1988) (summary judgment adjudication); *Beissinger v. Rockwood Computer Corp.*, 529 F. Supp. 770 (E.D. Pa. 1981) (post-trial adjudication).

the status of their operations in Japan. As the Court cogently explained in *Jaroslawicz v. Engelhard Corp.*, 704 F.Supp. 1296, 1299 (D.N.J. 1989), despite Defendants' caviling and carping to the contrary, those statements created a duty to speak on their part and rendered their omissions actionable under the federal securities laws:

> [T]his case presents a situation in which Engelhard's "duty to speak" arose due to the very fact that the company made statements concerning the health of its refining operations. In the Third Circuit, the making of an affirmative statement on a securities matter triggers a duty to include such information as would prevent the statements from misleading a reasonable investor. *See e.g., Eisenberg v. Gagnon*, 766 F.2d 770, 776–77 (3d Cir.1985), *cert. denied sub nom. Weinstein v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) (upholding that part of a jury instruction that liability requires an affirmative statement coupled with material omissions); *Flynn Bros.*, 744 F.2d at 984 (holding that a duty to speak arises when affirmative description of a tender offer is made); *Staffin*, 672 F.2d at 1204 (holding that affirmative statements trigger a duty to speak). Indeed, this rule may be found within *Texas Gulf Sulphur* itself. *Texas Gulf Sulphur*, 401 F.2d at 861–64. Plaintiff's "material omission" claim does not rely on some undisclosed-but-approaching event. Rather, it relies on the presence of affirmative statements rendered misleading by material omissions which, in the words of *Texas Gulf Sulphur*, deprived plaintiff and those similarly situated of "the disclosure of basic facts" which would have allowed them to "draw upon their own evaluative expertise in reaching their own investment decisions with knowledge equal to that of the insiders." *Id*. at 848–49.

Thus, Defendants' argument that their omissions are not actionable is pure makeweight.

### E. Defendants' Misstatements Are Not Statements of "Belief and Opinion"

Defendants contend that certain of the misstatements alleged in the Complaint are merely statements of "belief and opinion" and are, therefore, not actionable. However, as demonstrated above, Defendants' misstatements and omissions concerned *facts*, not opinions and, therefore, are actionable. Furthermore, to the extent that Defendants' statements were expressions of belief and opinion, they are actionable because Defendants knew them to be false when disseminated.

-34-

Defendants attempt to bolster their argument that the alleged misstatements are of "belief and opinion" by selectively quoting sections from the allegations where Defendants prefaced their statements with words such as "believe" and "think." However, merely beginning a sentence with the words, "I believe" does not magically transform a factual statement into a statement of belief and opinion. *See, e.g., In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 928 (D.N.J. 1998) (holding that the statement that "[Company] believes that the . . . acquisition will enhance its competitive position" was actionable).

*Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), is the seminal case establishing that statements of belief or opinion can be deemed actionable. There, the Court made clear that the doctrine it embodied pertains to statements that are not capable of being proved literally true or false. *Id*. at 1091-1094. The Court held that because statements of "judgment[] can be uttered with knowledge of truth or falsity just like more definite statements, and defended or attacked through the orthodox evidentiary process that either substantiates their underlying justifications or tends to disprove their existence," they could form the basis of a securities fraud claim. *Id*. at 1093. Implicit in this remark is the notion that a statement *could* be objectively proven false and misleading, such as Defendants' claim that "*[e]ven at this level of sales, we believe we have ample opportunity for further expansion, as Japan's 2012 population was over 127 million people and North America's was approximately 400 million people -- far greater than the more than four million who have already purchased our products*." ¶ 66.

Even if Defendants' statements could be deemed ones of belief or opinion, such statements "if known to be false, may be the basis of a claim." *Hayes v. Gross*, 982 F.2d 104,

106 (3d Cir. 1991). As shown above, the Complaint alleges facts that show, among other things, the statements concerning the efficacy of the no!no! device and the status of operations in Japan were known to be false when made.

**F.    Defendants Are Not Shielded from Liability by the Safe Harbor**

**1.    Defendants' Statements Are Not Forward Looking**

Defendants attempt to evade liability for their misstatements by asserting that some of these statements are forward-looking, and therefore, entitled to protection under the PSLRA safe harbor. However, Defendants cannot avail themselves of safe harbor protection because their misstatements were not forward-looking, nor were they identified as forward-looking and accompanied by meaningful cautionary language.

The PSLRA contains a statutory safe harbor for forward-looking statements that meet certain requirements. 15 U.S.C. § 78u-5. Under the safe harbor provision for written statements, "an issuer is not liable for a forward-looking statement if it is "identified as a forward looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *EP Medsystems*, 235 F.3d at 873 (citing 15 U.S.C. § 78u-5(c)(1)(A)(I)); *see also Avaya*, 564 F.3d at 256. Similar requirements are enumerated in the safe harbor provision for oral forward-looking statements. 15 U.S.C. § 78u-5; *see also City of Hialeah Employees Ret. Sys. v. Toll Bros., Inc.*, No. 07-cv-1513, 2008 U.S. Dist. LEXIS 66906, at *11-12 (E.D. Pa. Aug. 29, 2008) ("Plaintiffs have adequately pled that any cautionary statements accompanying Defendants' written and oral projections were not meaningful in light of Defendants' alleged failure to disclose then-existing material facts.").

Statements of past or present facts or circumstances (or omissions of material facts), however, are not forward-looking and, thus, are not covered by the safe harbor.[18] *See In re Cell Pathways, Inc., Sec. Litig.*, No. 99-cv-752, 2000 U.S. Dist. LEXIS 8584, at *42 (E.D. Pa. June 21, 2000)(citation omitted)("'[A]llegations based upon omissions of existing facts or circumstances do not constitute forward looking statements'"); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 721 (D. Del. 2000) (CEO's assurance to investors of company's current financial integrity were not forward looking statements); *Cal. Pub. Employees Ret. Sys. v. Chubb Corp.*, No. 00-4285-GEB, 2002 U.S. Dist. LEXIS 27189, at *33 (D.N.J. June 26, 2002) (holding that "purposeful omissions of existing facts or circumstances do not qualify as forward-looking statements"); *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (holding that "statements not contingent on future events" and not "projections about [a company's] financial future" are "statements of the Company's existing financial condition"); *In re MobileMedia*, 28 F. Supp. 2d at 930 (statement alleged to be misleading based on omissions of facts known to defendants did not qualify for safe harbor protection).

The safe harbor protection applies only to the following categories of statements:

> (1) a statement containing a projection of revenues or other financial items; (2) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer: (3) a statement of future economic performance; and (4) any statement of the assumptions underlying or relating to the aforementioned

---

[18] "'[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'" *Avaya*, 564 F.3d at 255 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008); *accord In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.")).

statements.

*In re Viropharma, Inc., Sec. Litig.*, No. 02-cv-1627, 2003 U.S. Dist. LEXIS 5623, at * 23-24 (E.D. Pa. April 3, 2003)(internal quotation marks omitted), quoting 15 U.S.C. § 78u-5(i)(1). But the Complaint does not allege that Defendants misled investors about their "plans and objectives . . . for future operations," but, rather, about the present status of their core product and a key market -- Japan.

Indeed, the statements identified as forward-looking do not pertain to Defendants' "plans and objectives" for the Company. Similar misstatements concerning "the current status" have been found not to be forward-looking because "the truth or falsity" of the statements was "determinable at the time they were made." *In re Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *25. Furthermore, the mere fact that Defendants' misstatements appear in the same document as statements identified as forward-looking does not afford these misstatements safe harbor protection. The gravamen of the Complaint is that Defendants misrepresented the current efficacy of their core product and the actual status of operations in Japan and related prospects in that country. The Court should not be distracted by Defendants' efforts to "pull isolated forward-looking statements out of the documents at issue in this case . . . Simply because material misrepresentations appear in the same document as a forward-looking statement does not make the statements of fact eligible for the safe harbor." *In re Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *26.

## 2.     The Misstatements Were Not Accompanied by Cautionary Language

The question of whether purportedly "cautionary language" identified by Defendants is "sufficiently 'meaningful' raises fact issues that are improperly resolved" at the motion to dismiss phase. *In re Lucent*, 217 F. Supp. 2d at 557.  Furthermore, Defendants face a high burden to identify appropriate cautionary language which "'must be substantive and tailored to the specific predictions made in the allegedly misleading statement.'"  *In re Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *27-28, quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993).  "Cautionary language must be 'extensive and specific.'"  *Avaya*, 564 F.3d at 256 (quoting *GSC Paryners CDO Fund v. Wash.*, 368 F.3d 228, 243 n.3 (3d Cir. 2004) (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000)).  "'[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.  To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.'"  *Id.* (quoting *Semerenko*, 223 F.3d at 182).

Defendants fail to cite to any meaningful cautionary language.  Although Defendants identified Ya-Man as their sole Japanese distributor and identified this as a risk factor, they never apprised the market in any way, shape or form that (a) the Company's Japanese distributor was experiencing severe financial issues and declining sales, (b) sales in the critical Japanese market were flagging significantly during the Class Period,  or (c) the Company's flagship product did not work as represented.  Under these circumstances, Defendants' examples of "cautionary language" are precisely the type of "vague or blanket boilerplate disclaimer" that does not qualify as meaningful cautionary language.  *In re Donald J. Trump*, 7 F.3d at 371-72.

Finally, as with statements of belief and opinion, Defendants are not entitled to safe harbor protection where they already know their statements to be false. *In re Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *29 (holding that a defendant "may not use cautionary language to protect himself when he is already aware that the risks he is cautioning against have come to fruition").[19] No amount of cautionary language insulates such conduct from liability: "the safe harbor will not apply if the statement was made with 'actual knowledge' that the statement was false of misleading." *In re Advanta*, 180 F.3d at 536; *accord In re Veritas Software Corp. Sec. Litig.*, No. 04-cv-831-SLR, 2006 U.S. Dist. LEXIS 32619, at *20 (D.Del. May 23, 2006)("No manner of cautionary language can cure false statements knowingly made."). "In other words, the safe harbor provision does not afford corporations a free pass to lie to investors." *In re Veritas*, 2006 U.S. Dist. LEXIS 32619, at *20.[20] Here, as noted above, Defendants knew that their core product lacked efficacy and that sales were flagging in Japan.

---

[19]*See also Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1127 (7th Cir. 1993) ("A prospectus stating a risk that such a thing *could* happen is a far cry from one stating that this *had* happened. The former does not put an investor on notice of the latter."); *MobileMedia*, 28 F. Supp. 2d at 930 ("Warnings of possible adverse events are insufficient to make omissions of present knowledge of certain future events legally immaterial."); *In re Nash Finch Co. Sec. Litig.*, 502 F. Supp. 2d 861, 873 (D. Minn. 2007) ("This Court concludes that cautionary language can not be 'meaningful' when defendants know that the potential risks they have identified have in fact already occurred, and that the positive statements they are making are false.").

[20]*See also Gargiulo v. Demartino*, 527 F. Supp. 2d 384, 389 (E.D. Pa. 2007) ("Thus, though some of the statements are forward-looking and contain cautionary language, they are still not protected by the PSLRA safe harbor because Plaintiffs allege that Defendants had actual knowledge of falsity . . . (stating that the safe harbor protection would not apply if the plaintiff proved that there was actual knowledge that the statement was false or misleading.")).

### G.     The Misstatements Are Material and Are Not Mere Puffery

Defendants contend that the alleged misstatements constitute immaterial "puffery" and are therefore not actionable. As explained above, materiality determinations are generally not appropriate for a motion to dismiss. To constitute puffery, a statement must be a "statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism." *EP Medsystems Inc.*, 235 F.3d at 872. Thus, there is some overlap between statements of puffery and statements of belief or opinion. However, none of the statements Defendants categorize as puffery are "general statements of optimism" or suggest an opinion, motive or intention of their speakers. The challenged statements and omissions regarding the efficacy of the no!no! device were presented as objective, factual statements by Defendants. Likewise, Defendants reports on their market share in Japan, business prospects based on *current levels* and performance of their Japanese distributor were not "general statements of optimism" but, instead, were presented as factual statements (which Defendants knew to be false based upon facts in their possession). Therefore, Defendants' puffery argument -- even if properly considered at this procedural stage -- fails as a matter of law.

### H.     Plaintiffs' Allegations Raise A Compelling Inference Of Defendants' Scienter

#### 1.     Plaintiffs' Allegations Must Be Considered Holistically In Determining Whether They Raise A Strong Inference of Scienter

Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, n.12 (1976)). Under the pleading requirements of the PSLRA, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" in order

to establish the element of scienter. 15 U.S.C. § 78u-4(b)(2); *Avaya*, 564 F.3d at 267. "This scienter standard requires plaintiffs to allege facts giving rise to a 'strong inference' of 'either reckless or conscious behavior.'" *Avaya*, 564 F.3d at 267 (quoting *In re Advanta*, 180 F.3d at 534-35).

The PSLRA requirement that the plaintiff plead with particularity facts giving rise to a "strong inference" of scienter requires courts to weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314; *see also id.* at 324 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'") The question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323; *see also id.* at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"); *Avaya*, 564 F.3d at 267-68.

As the Third Circuit explained in *Avaya*:

> Accordingly, as with all totality-of-the-circumstances tests, our analysis will be case specific. It will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter. *See South Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."); *see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 32 (1st Cir. 2002) ("Each securities fraud complaint must be analyzed on its own

-42-

facts; there is no one-size-fits-all template.").

*Id.*, 564 F.3d at 269.  As the Third Circuit also explained, "[b]ut inference is not arithmetic [and] [t]he inferential significance of any single allegation can be determined only by reference to all other allegations."  Id. at 273.  The Third Circuit's analysis concluded as follows:

> Although we have discussed each of the alleged facts bearing on defendants' scienter one at a time, we have heeded *Tellabs's* command to evaluate Shareholders' allegations collectively rather than individually.  As we have taken up each allegation in turn, we have added it to the picture painted by the previously considered allegations and asked: How does this addition affect the relative strengths of the culpable and non-culpable inferences?

*Id.* at 280.  Here, the Complaint makes out a compelling case of scienter as to all Defendants.[21]

### 2.    The Complaint Alleges Conscious Misbehavior And/Or Recklessness

The Complaint sets forth multiple categories of allegations which, taken together and reviewed collectively, require a finding that Defendants intentionally or recklessly misled investors, and that this is the most cogent and compelling inference to be taken from their

---

[21]Defendants quarrel most strongly with scienter having been made out as to McGrath because he had less insider sales than Rafaeli (although McGrath also managed to unload roughly one-third of his stock holdings).  In so arguing, however, Defendants ignore the fact that the Complaint contains specific allegations with respect to McGrath's knowledge before and during the Class Period regarding the lack of efficacy of PhotoMedex's core device, and problems in the Japanese market, as well as his role as the key financial person at the Company who was intimately involved in making public statements related to the efficacy of the core product and the importance of the Japanese market with full knowledge of the terms of *Tria* Litigation and *Tria* Settlement.  ¶¶ 44, 52, 64, 70, 73-77, 83, 86, 95-97.  It also bears noting that, since Lead Plaintiff pleads scienter as to at least one corporate officer, scienter has been adequately pled as to PhotoMedex itself and the Court need not address the open question of whether corporate or collective scienter can serve as a basis to plead scienter as to a corporation in this Circuit. *See Rahman v. Kid Brands, Inc.*, No. 11–1624-JLL, 2012 WL 762311, at *16-21 (D.N.J. Mar. 8, 2012)(discussing issue of corporate/collective scienter and acknowledging that where, as here, "one individual acting on behalf of the corporation made a false statement with the requisite state of mind," corporate scienter is established), *aff'd* 736 F.3d 237, 246 (3d Cir. 2013)(discussing but not reaching the issue of corporate/collective scienter).

material misstatements and omissions concerning the efficacy of the no!no! device and the status of the Company's operations and sales in Japan.

> **a.** **Defendants, As The Top Executives Of The Company, And Based Upon Their Specific Statements And Acknowledgments, Raise An Inference Of Their Knowledge Regarding The Company's Core Product, Its Lack Of Efficacy And The Actual Status Of Its Operations In Japan**

The Complaint alleges that Defendant, Rafaeli, was the CEO of Radiancy from 2006 to 2011, whereupon he became the CEO of PhotoMedex after its reverse merger with Radiancy. ¶¶ 4, 20. Furthermore, the Complaint alleges that, after the reverse merger creating the new PhotoMedex, the no!no! device became the Company's new flagship product and the main revenue and profit driver for PhotoMedex, as confirmed explicitly by the Company's SEC filings. ¶¶ 4, 29. As the Complaint explains in detail, Rafaeli has known about problems with the no!no! device (which was described by one confidential witness as Rafaeli's "baby") since at least 2009 and that it lacks efficacy. ¶¶ 28, 40, 91-93. In addition, Radiancy received a demand letter alleging that the Company violated California consumer fraud laws with respect to the no!no! device in November 2011. ¶ 90.

Likewise, following the reverse merger, McGrath assumed the position of President and CFO of the new PhotoMedex. ¶¶ 4, 21. McGrath also was the CEO of PhotoMedex when Radiancy disclosed the pendency of the *Tria* Litigation as part of the reverse merger process in 2011. ¶ 95. As a as a result of the *Tria* Litigation (which challenged the Company's advertising with respect to its core product and its driver of revenues and profitability), and the *Tria* Settlement (which resulted in the Company being required to curb its advertising practices with respect to the no!no! device), about which Rafaeli and McGrath had and demonstrated complete

knowledge, it is clear that both Rafaeli and McGrath knew (before the Class Period commenced) about the significant issues regarding the no!no! device's efficacy. ¶¶ 96-97.

Likewise, the Japanese market was extremely important to PhotoMedex throughout the Class Period and both Rafaeli and McGrath repeatedly pronounced the close monitoring of the Japanese market undertaken by them and the Company. The Japanese market for the no!no! device has been identified by Defendants as a critical market for the Company since 2011 because it accounted for approximately 20% of PhotoMedex's sales and repeatedly was identified as a key market for the Company both before and throughout the Class Period. ¶¶ 31, 46, 52, 55, 57, 66, 70, 74. Moreover, both Rafaeli and McGrath acknowledged the importance of the Japanese market to PhotoMedex and that the Company had the ability to and was closely monitoring sales in Japan throughout the Class Period. ¶¶ 11, 83, 86.

As the Complaint explains, Rafaeli and McGrath, along with Michael R. Stewart and Giora Fishman, were known as the "Committee of Four," and these individuals made all significant business decisions at PhotoMedex and were intimately involved in all marketing-related decisions with respect to PhotoMedex's products. ¶ 22. As the Complaint also explains, McGrath himself identified Rafaeli as being the consummate marketer for PhotoMedex, while identifying himself as being the person at the Company with financial reporting expertise. ¶ 103. McGrath and Rafaeli also led each and every conference call with investors during the Class Period and are intimately familiar with all of the Company's business operations in the small enterprise that is PhotoMedex. *Id.* Given their acknowledged roles at the Company and the size of PhotoMedex in general, the facts give rise to a strong inference of the Individual Defendants' knowledge and scienter with respect to the false and misleading statements and accompanying

material omissions at issue in this case.  *Id.*

As a result of the high-ranking positions of Defendants Rafaeli and McGrath -- in addition to the fact that both Rafaeli and McGrath were intimately involved in the marketing and sales, as well as financial reporting, regarding the no!no! device and on specific notice with respect to the lack of efficacy of the no!no! device and problems in the key Japanese market -- the Court should infer that they had full knowledge of all the facts surrounding the no!no! device, including the fact that it lacked efficacy, the problems being experienced and flagging sales in Japan, and that the Company's specific representations and omissions regarding the flagship product, including that the no!no! device worked no better than a razor, and neither eliminated nor reduced hair/hair regrowth, ¶¶ 48-50, 52, 55, 57, 60, 62, 64, 68, 70, 72, 74, as well as the fact that, based upon current sales levels, PhotoMedex had strong prospects in Japan (when it actually was failing in Japan), ¶¶ 52, 55, 57, 66, 68, 70, 72, 74, all were false.  When a high-ranking officer of a company makes a public statement regarding "core operations" of the company, and that statement turns out to be false, courts often infer that the speaker knew the statement was false when made.[22]  *See Avaya*, 564 F.3d at 270 ("Given the specificity and repetition of the

_____

[22]Defendants' reliance upon *Rahman v. Kid Brands, Inc.*, 736 F.3d 237 (3d Cir. 2013), as part of their attempt to distinguish *Avaya*, is unavailing.  In *Kid Brands*, the Third Circuit Court of Appeals merely distinguished *Avaya* because the executives in *Kid Brands* and, unlike here, had not responded to pointed inquiries or made public pronouncements on the subjects about which they were alleged to have knowledge, there were no additional scienter allegations in *Kid Brands* (unlike here) and the "core operations doctrine" could not be applied in *Kid Brands* in any event because the alleged wrongful conduct in *Kid Brands* involved a relatively small amount of money as a result of alleged wrongful conduct at subsidiaries over a period of nearly five years. Id. at 246-47.  Here, as Defendants' own public filings and pronouncements make clear, the no!no! device and the Japanese market were core to PhotoMedex's success -- that is why Defendants, including the Individual Defendants, demonstrated consistent knowledge about these subjects.

analysts' questions, McGuire's position as Chief Financial Officer, and the alleged state of

Avaya's business at the time the questions were asked, there is a strong inference that McGuire's

behavior reached this threshold of recklessness."); *In re RAIT*, 2008 U.S. Dist. LEXIS 103549,

at *50 ("Because the alleged misstatements involved RAIT's core business operations and

because the Officer Defendants had ample reason to know of the falsity of their statements, there

is a strong inference of scienter in this case.").[23]

    As noted above, Defendants Rafaeli and McGrath were high-ranking officers of

PhotoMedex and, therefore, knowledge of the Company's key operations and core products can

be imputed to them. Furthermore, there can be no dispute that the no!no! device was the "core

product" of PhotoMedex, and the driver of revenues and profits at the Company, ¶ 29, while the

Japanese market was key to the business operations and prospects of PhotoMedex. ¶ 31.

Indeed, both McGrath and Rafaeli repeatedly stated and certified that this was the case both

before and throughout the Class Period. ¶¶ 29, 31, 46, 50, 52, 55, 64, 66, 68, 70, 72, 74, 76, 77.

---

[23]*See In re Tel-Save Sec. Litig.*, No. 98-CV-3145, 1999 U.S. Dist. LEXIS 16800, at *14-15 (E.D. Pa. Oct. 19, 1999) (where one director personally and often solely negotiated some transactions and participated in many others that were a significant part of the company's business); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (knowledge of "widespread integration problems" following an $8.9 billion merger imputed to top corporate officers); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001) (where defendants participated in discussions about improper company practices during which others expressed reservations about those practices and called for them to stop); and *In re Viropharma*, 2003 U.S. Dist. LEXIS 5623, at *31-32 (where pharmaceutical company's highest ranking members undisputedly had access to clinical trial reports questioning the efficacy and safety of a drug); *In re Loewen Group Inc. Sec. Litig.*, No. 98-6740, 2004 U.S. Dist. LEXIS 16601, at *67 (E.D. Pa. Aug. 18, 2004) (where a plaintiff pleads "alleged fraud concerning a corporation's core business and the defendant held a position from which he would have been aware of the true facts and misleading disclosures, scienter is pleaded sufficiently"); *In re Vicuron*, 2005 U.S. Dist. LEXIS 15613, at *18 (E.D.Pa. July 5, 2005)(where key officers and directors knew or must have known of false or misleading statements because the statements involved the company's lead product).

Therefore, the Court can infer that Defendants had knowledge regarding the lack of efficacy of the no!no! device and the extreme difficulties being experienced in the Japanese market. As the Seventh Circuit found in *Tellabs,* 513 F.3d at 707-09, alleged statements concerning the company's "flagship" product make an inference of innocence "exceedingly unlikely." The court reasoned "[t]hat no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [core products] knew that they were false is very hard to credit, and no plausible story has yet been told by the defendants that might dispel our incredulity." *Id.* at 709. Similarly, here, an inference that Defendants did not know that the no!no! device lacked efficacy and that sales were failing in Japan is "exceedingly unlikely."[24]

> **b.  Defendants' Knowledge Regarding The Lack Of Efficacy Of The No!No! Device And Falling Sales In Japan**

As detailed above, the Complaint cogently explains why Defendants knew that the no!no! device lacked efficacy and that sales in the key Japanese marketplace were dramatically slowing.

---

[24]Under these circumstances, the fact that both Rafaeli and McGrath signed certifications pursuant to the requirements of SOX for all of the Form 10-Qs and 10-Ks filed with the SEC during the Class Period, stating that the financial information contained in the Form 10-Qs and 10-K was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal controls over financial reporting, *see* Complaint at ¶ 76, also supports a determination that scienter has been adequately pled. *See, e.g., In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 620 (E.D. Pa. 2009)("courts addressing the issue of whether SOX certifications contribute to scienter have found that SOX certifications themselves are not actionable, and that to support an inference of scienter, something more is needed"); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265-66 (11th Cir. 2006) (finding a SOX certification probative of scienter only if plaintiffs show that the person signing the certification was "severely reckless" in certifying the accuracy of its financial statements); *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 356-57 (D.N.J. 2007)(stating that SOX certifications establish scienter only if the complaint asserts facts indicating that, at the time of certification, the defendants actually knew or at least turned a "blind eye" to information indicating that the certifications were erroneous).

¶¶ 28, 32-36, 42-44, 46, 49, 54, 56, 58, 61, 63, 67, 69, 71, 73, 75.   Defendants argue that the

Complaint does not include allegations of contemporaneous facts to demonstrate that they

possessed knowledge of the falsity of their statements during the Class Period.  However, the

Complaint's allegations that Defendant Rafaeli knew *since at least 2009* that the no!no! device

lacked efficacy and that McGrath knew the same since at least 2012 when he became privy to the

Dr. Biesman study, ¶¶ 28, 32-36, while the Complaint also specifically pleads the specific (and

mathematical) reasons why, despite their continued statements throughout the Class Period about

the importance and prospects of the Japanese market for the no!no! device, Rafaeli and McGrath

were on notice of flagging sales and significant problems in Japan, *see, e.g.,* ¶¶ 75, 83, 86, all of

which adequately pleads and establishes knowledge held during the Class Period as well.  Any

competing inference is "exceedingly unlikely" and implausible.

> **c.      *Defendants' Failure To Seek FDA Approval Of The No!No!
> Device Strongly Supports The Averments Of Scienter***

The Complaint also explains that Defendants' knowledge regarding the fact that the

no!no! device neither eliminates nor reduces hair density or re-growth is confirmed by the fact

that neither Radiancy nor PhotoMedex ever sought approval by the Food and Drug

Administration ("FDA") of a premarket application or clearance by the FDA of a premarket

notification under Section 510(k) of the Food, Drug and Cosmetic Act, which is required for any

instrument that "is intended to affect the structure or any function of the body of man."  21

U.S.C. § 321(h)(3).  ¶ 94.  As CW3 explained, in other instances, Radiancy and, specifically,

Radiancy Clinical Manager, Julia Rothman, obtained FDA 510(k) clearance with respect to other

Radiancy products.  *Id*.  The fact that neither Radiancy nor PhotoMedex ever sought such FDA

510(k) clearance with respect to its flagship no!no! device constitutes strong evidence that it was well known, at all pertinent times, that the no!no! device lacked efficacy in eliminating or reducing body hair any better than a razor, despite Defendants' specific representations to the contrary. *Id*. As Confidential Witness Two ("CW2") also explained, the Company's failure to seek FDA 510(k) clearance strongly suggests that PhotoMedex is well aware that the no!no! device neither permanently nor even semi-permanently alters the human body because, if the no!no! device actually worked as advertised and represented, FDA 510(k) clearance certainly would be required. *Id*.; *see also* 21 U.S.C. § 321(h)(defining device for which FDA 510(k) clearance is required before marketing to include any device "intended to affect the structure or any function of the body of man . . ., and which does not achieve its primary intended purposes through chemical action within or on the body of man . . . and which is not dependent upon being metabolized for the achievement of its primary intended purposes"); 21 U.S.C. § 360 (outlining the FDA 510(k) pre-market clearance requirements for covered devices).

Defendants' argument that FDA 510(k) pre-market clearance was not required for the no!no! device, *see* Defs' Mem. at 33, n.24, misses the point entirely. As the Complaint cogently explains, if the no!no! device functioned as Defendants claimed in their public pronouncements to investors throughout the Class Period by permanently eliminating hair or reducing the rate of regrowth of hair, then such pre-market clearance would have been required. Thus, Defendants' failure to seek FDA 510(k) pre-market clearance (consistent with their counsel's assertion that it was not required) strongly supports the inference that Defendants knew all along that the no!no! device lacked efficacy and was no more effective than a razor. ¶ 94. That is especially true since Radiancy had specific experience in seeking 510(k) clearance when required. *Id.* "'The fact that

the defendants published statements when they knew facts suggesting the statements were

inaccurate or misleadingly incomplete is classic evidence of scienter.'" *See Anderson v.*

*Peregrine Pharms.*, *Inc.*, No. 12-cv-1647-PSG, 2013 WL 4780059, at *8 (C.D. Cal., Aug. 23,

2013)(quoting *In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1001–02, 1022–24 (S.D.

Cal. 2005)).

> ### d. Defendants' Apparent Change In Their Consumer Advertising As A Result Of The Confidential Tria Settlement While They Continued To Misrepresent Facts Regarding The Efficacy Of The No!No! Device Likewise Provides Strong Support For The Scienter Averments

Despite Defendants' "high" rhetoric (referring to Lead Plaintiff's averments as

speculation), *see* Defs' Mem. at 15, and attempt to explain away the changes in PhotoMedex's

representations to consumers regarding the efficacy of the no!no! device, the Complaint pleads

strong facts establishing that the *Tria* Settlement (albeit confidential) required PhotoMedex to

change its advertising to consumers:

- [T]he Company continued to tout the efficacy and "competitive advantages" of the no!no! device to investors -- using representations that it withdrew from its consumer advertising as a result of the competitor's lawsuit, but which it continued to use in trumpeting PhotoMedex's products and prospects to investors. Significantly, despite the fact that the confidential terms of the settlement amounted to an admission that PhotoMedex's flagship product lacks efficacy, the Company and its officers explicitly denied that the lawsuit and the settlement of that lawsuit had or would have any material impact on the Company's business. ¶¶ 8, 36-37.

- Tria stated in its press release regarding the *Tria* Settlement that "[w]e achieved all of our objectives and sent a clear message that we all must play by the rules, on a level playing field," while also stating that "[a]s Radiancy documents submitted in court show, Radiancy deliberately engaged in a massive advertising campaign based on bogus claims lacking any scientific basis, including knowingly false claims that the no!no! 'provides an effect similar to what lasers accomplish in the dermatologist office'; produces 'laser-like results'; is 'like laser and IPL [intense pulsed light] treatments, the heat gradually disrupts the hair growth cycle' [and]

-51-

"Radiancy claimed that the no!no! Hair provided 'up to 94% reduction in hair re-growth', allowed users to 'get rid of unwanted hair and keep it gone' and 'have a life of freedom from hair.' As Radiancy admitted in papers filed with the court shortly before the settlement, it has dropped all such claims as a result of Tria's lawsuit." ¶ 38.

● Although the terms of the confidential *Tria* Settlement remain undisclosed, the Company's consumer advertisements have changed. PhotoMedex no longer represents that the no!no! device will result in near-100% reduction or even permanent elimination of hair re-growth, or compares the no!no! device to lasers, or that using the no!no! device will result in any "permanent" reduction of hair or hair re-growth, or work as well as laser hair removal products. ¶ 42.

Thus, rather than constituting "rank speculation" as Defendants accuse, the only plausible inference to be taken from these facts, which Defendants do not dispute, is that the *Tria* Litigation and the *Tria* Settlement required PhotoMedex to change its consumer advertisements.[25] The fact that those changes were made, but Defendants continued to make the false claims in their public statements to shareholders, which they had eliminated from consumer advertisements, makes out a convincing case that Defendants acted with scienter.

> ### e.     *Defendants' Massive Sell-Off While In The Possession Of Material, Adverse Inside Information*

The two Individual Defendants engaged in massive insider sales for proceeds of more $17 million during the Class Period and while in possession of material, non-public information. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277-78 (3d Cir. 2006), *abrogated on other grounds by Avaya*, 564 F.3d at 277 (finding that where two of six defendants sold stock for $7 million in proceeds, strong inference of scienter was supported). As the Complaint details,

---

[25]If Defendants' rhetoric is meant to imply that the *Tria* Litigation resulted in the Company changing its consumer advertising before entering into the *Tria* Settlement, that distinction is of little moment -- as the result and the inference is the same from a scienter perspective.

Rafaeli sold 1,028,750 shares for $15,864,944.80 during the Class Period, which represents 51.55% of his holdings at the beginning of the Class Period. ¶ 100. Before the Class Period but while he was in the possession of material, non-public information regarding the efficacy of PhotoMedex's core product, as explained above, Rafaeli established a SEC 10b5-1 plan to sell stock which resulted in Class Period sales of stock between October 4, 2012 and March 13, 2013 of 528,750 shares for proceeds of $7,980,989.81. Then, on May 20, 2013, Rafaeli established another SEC 10b5-1 plan during the Class Period, which resulted in a similar amount of Class Period sales of stock between May 20, 2013 and September 3, 2013 of 500,000 shares for proceeds of $7,883,954.99. Notably, Rafaeli also established yet another 10b5-1 plan on September 10, 2013, which resulted in the post-Class Period transactions from January 13, 2014 to April 1, 2014, inclusive, with $6,473,808.31 proceeds in sales of another 442,559 shares. Thus, since the reverse merger and to date, Rafaeli has sold or otherwise disposed of 2,045,301 shares of Company stock -- in other words, 80% of his stock in PhotoMedex. The fact that Rafaeli has dumped 80% of his Company stock (largely as a result of Class Period actions) provides strong support for the averments of scienter.

Meanwhile, as detailed in the Complaint, McGrath sold 101,795 shares for $1,500,574.41 during the Class Period, all while in the possession of material, non-public information. ¶ 101. This amounted to 33.70% of his holdings going into the Class Period, or 32.14% of his total post-merger holdings. *Id*. The Class Period and pre-Class Period sales were the results of a 10b5-1 plan set on June 11, 2012 when, as outlined in detail above, McGrath already knew about the substantial issues with the efficacy of the no!no! device.

Defendants' attempt to avoid the effect of their insider selling on the basis that the sales

occurred pursuant to SEC 10b5-1 plans, is unpersuasive.  *See* Defs' Mem. at 30.  As Defendants

ignore in their Motion to Dismiss, the Complaint specifically explains as follows:

> The fact that the insider stock sales at issue by Rafaeli and McGrath occurred
> pursuant to 10b5-1 plans serves no basis as a defense to the strong inference of
> scienter created by these sales because, at the time that they entered into their
> initial 10b5-1 plans on June 7, 2012 and June 11, 2012, respectively, both Rafaeli
> and McGrath were in possession of material, non-public information regarding the
> *Tria* Litigation, including the expert report produced by Tria establishing that the
> no!no! device is no more effective than a razor.  Moreover, it bears noting that
> these 10b5-1 plans were adopted shortly before the *Tria* Settlement was
> announced and Defendants issued their false and misleading statements regarding
> the *Tria* Settlement while continuing to misrepresent the efficacy of the flagship
> no!no! device in investor communications.  Likewise, when Rafaeli adopted the
> subsequent 10b5-1 plans, respectively, on May 20, 2013 and September 10, 2013,
> as outlined above, he was in possession of material, non-public information
> regarding the business operations and prospects of PhotoMedex, which he failed
> to disclose to the investing public.  Finally, a 10b5-1 plan cannot serve as a
> defense to a charge of insider trading when it is not adopted in good faith, and the
> facts pled above establish that neither Rafaeli nor McGrath acted in good faith or
> could claim that these plans for future stock were adopted in good faith.

Complaint at ¶ 102.  The failure of the existence of 10b5-1 plans to rebut the inference of

scienter created by massive insider sales has been recognized in similar cases.  In *La. Mun.*

*Police Employees' Ret. Sys. v. Green Mt. Coffee Roasters, Inc.*, No. 2:11-cv-289, 2013 U.S. Dist.

LEXIS 178759, at *44-45 (D. Vt. Dec. 20, 2013), the Court persuasively explained that logic:

> Plaintiffs rightly state that some courts have found that the defensive value of a
> 10b5-1 trading plan is diminished when the plan is entered into *during* the Class
> Period, as was the case here. For example, courts within this Circuit have found
> that where 10b-1 plans are "entered into—or strategically amended—to take
> advantage of an inflated stock price or insider information . . . they are not a
> cognizable defense to scienter allegations on a motion to dismiss." *George v.*
> *China Automotive Systems, Inc.*, No. 11 Civ. 7533(KBF), 2012 U.S. Dist. LEXIS
> 111730, 2012 WL 3205062, at *9 (S.D.N.Y. 2012)(internal quotations omitted);
> *see also Freudenberg*, 712 F. Supp. 2d at 171 (finding that a 10b5-1 trading plan
> may support an inference of scienter because "a clever insider might maximize

their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan" (internal quotation omitted)).

*See also In re NutriSystem Sec. Litig.*, 653 F. Supp. 2d 563, 576 (E.D. Pa. 2009)(where, unlike here, "[t]he defendants note that each of these sales was made pursuant to a Rule 10b5–1 plan. . ., [a] Rule 10b5–1 plan prearranges stock transactions and provides an affirmative defense to an allegation of insider trading, provided the plan is adopted in writing prior to becoming aware of material non-public information. . . . [and] [t]he plaintiffs have not alleged that the defendants' plans were adopted at a time when any defendant was aware of material nonpublic information.") Thus, under the actual facts pled in the Complaint, as opposed to Defendants' self-serving gloss upon them, the massive insider sales during the Class Period support a strong inference of scienter.

> ### f. Defendants' Large Stock Repurchases To Prop Up The Price Of Company Stock While They Disposed Of Enormous Quantities Of PhotoMedex Stock At Inflated Prices

The Complaint explains that "[d]uring the Class Period, the Company conducted a $25 million stock repurchase program followed by a $30 million program a year later at near annual high prices" and that "[g]iven the market capitalization of the Company (approximately $250-275 million), a share repurchase program of $55 million is quite significant in nature." ¶ 99. The Complaint also explains that "share repurchase programs increase share price by increasing demand for sales and increase a company's earnings per share" and cites academic research explaining that share repurchase programs are in the interest of short-term stockholders and management that is looking to capitalize on stockholdings or stock options. *Id.*, *citing* Bens, Nagar, Skinner and Wong, *Employee Stock Options, EPS Dilution and Stock Repurchases*, 36

Journal of Accounting and Economics at No. 1-3 (2003); Maxwell Murphy, *The Pros and Cons of Stock Buybacks* (Wall Street Journal) (February 27, 2012),

http://online.wsj.com/news/articles/SB10001424052970203824904577211389103 5614390

("Most academic research shows that share prices typically increase when buybacks are announced, which benefits short-term owners [and] [f]or those interested in long-term value creation, which should be the focus of managements and boards, the evidence convincingly shows that buybacks usually do not help"); Voss, *Major Themes in Economics* at 55-74 (Spring 2012), http://business.uni.edu/economics/Themes/voss.pdf ("[u]ndervaluation is consistently touted as the underlying reason for a repurchase" but "[e]vidence originating from the topic of managerial incentives, specifically the increase earnings per share hypothesis and the managerial stock incentives hypothesis, seems to explain best the popularity of repurchases"). Here, under the circumstances, while McGrath and Rafaeli were selling significant percentages of their shares during the Class Period, the stock repurchase program actually supports an inference of scienter.[26] Simply put, Defendants were propping up the stock price of PhotoMedex while they

---

[26]Defendants strangely take Lead Plaintiff to task for not "contesting" Defendants' public explanation that the stock repurchase programs were adopted to combat short-sellers. First, there is no requirement that Lead Plaintiff challenge every public statement made by Defendants (whether true or not). Second, as Defendants critically ignore, the alleged fact that the stock repurchase programs were adopted to combat short-sellers only confirms the fact that Defendants were seeking to prop up the price of Company stock while they dumped significant percentages of the same. *See, e.g.,* Chen, *The Informational Role of Short Sellers –the Evidence from Short Sellers' Reports,* Department of Accounting, the London School of Economics and Political Science, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2385697 (June 16, 2014)(noting that "[s]hort sellers are considered as particularly well-informed and sophisticated investors" and concluding that "[s]hort sellers tend to target firms that exhibit good operating and stock performances, and that show red flags of financial miscreants" and that "[s]hort sellers' reports convey valuable information independent of short interest, and short sellers are more effective than equity analysts"). Here, of course, it was a short seller's reports that led to the corrective disclosures at issue in this case. And, given the magnitude of the insider sales and concomitant

sold off their interest in the Company.

Defendants argue that the uniform view is that share repurchase programs negate an inference of scienter. ***Not so***. In *In re Countrywide Financial Sec. Litig.*, 588 F. Supp. 2d 1132, 1187-88 (C.D. Cal. 2008)(emphasis added), the court explained:

> Nevertheless, some trading allegations do contribute to a strong inference of scienter. Countrywide began its first-ever stock repurchase plan in November 2006. It announced a second in May 2007. Meanwhile, some Countrywide insiders allegedly began selling their Countrywide stock at higher-than-usual rates during the repurchases. ***Countrywide's buying could reasonably have augmented market demand, making it easier for insiders to find buyers and allowing more sales without depressing prices***. *See In re Countrywide Financial Corp. Deriv. Litig.*, 554 F.Supp.2d at 1067 (discussing the insider trading patterns during the repurchases).
>
> Further, companies generally repurchase their undervalued stock with their own cash (or other assets) because they believe its own stock will yield a better return than other investments. That is, repurchases signal to the market that a company believes its stock is undervalued, ¶¶ 494–95. Repurchases therefore might contribute to a price increase, propping up the prices insiders receive. . . ..
>
>           \*      \*      \*
>
> Again, as insiders were selling, Countrywide was buying -- with newly raised capital rather than existing cash reserves. The CAC therefore creates a strong inference that Countrywide's explanation for its stock repurchase plan was

---

stock repurchases, one could convincingly (as well as more plausibly than not) argue that over one-third of the stock repurchases (or more) were used to compensate Rafaeli and McGrath by paying them artificially inflated prices for PhotoMedex stock. Of course, massive insider sales during a period of a stock repurchase program is entirely inconsistent with the ostensible purpose of a stock repurchase program (perceived undervaluation of a stock), and that ostensible purpose is why courts in some cases (but not in circumstances similar to those here) have found in those limited circumstances that share repurchase programs are inconsistent with findings of scienter. *See, e.g.*, Bonaimé and Ryngaert, *Insider trading and share repurchases: Do insiders and firms trade in the same direction?*, http://gatton.uky.edu/faculty/bonaime/Insider_trading_and_share_repurchases_2010_08.pdf ("Signaling undervaluation is often considered a primary motive for repurchasing stock, but insider trading at repurchasing firms is not consistent with undervaluation" and "[w]hile insider buying during a share repurchase is consistent with expectations, net insider selling during a share repurchase is more puzzling").

economically suspect.  As the Court observed in the *Derivative Litigation*, "How could the [Countrywide] Board members approve a repurchase of $2.4 billion dollars worth of stock, and nearly contemporaneously liquidate $148 million of their personal holdings just months before the stock dropped some 80–90%?" 554 F.Supp.2d at 1067.

The Court is faced with the same or a similar circumstance here.  While the Company spent $55 million to prop up its stock price with a total market capitalization of only approximately $250-275 million, insiders McGrath and Rafaeli sold over $17 million in stock during the Class Period and, as explained above, Rafaeli dumped over 80% of his PhotoMedex stock in a period of approximately 18 months (and mostly during the Class Period).

While certain courts have reached the conclusion that stock repurchase plans are inconsistent with an inference of scienter, as cited by Defendants, *see* Defs' Mem. at 31, n.23, all of those cases are easily distinguishable.  In *In re Cisco Systems Inc. Sec. Litig.*, No. 11-cv-1568-SBA, 2013 WL 1402788, at *8 (N.D. Cal. Mar. 29, 2013), addressed a situation in which a company had engaged in a long-standing stock repurchase program that in no way was tied or connected to alleged insider sales -- a circumstance not present here.  Likewise, *Plumbers and Pipefitters Local Union v. Zimmer*, 673 F.Supp.2d 718, 749 (S.D. Ind. 2009), *aff'd* 679 F.2d 952 (7th Cir. 2012), does not address a circumstance, such as those present here, where massive insider sales occurred coincident with a large share repurchase program.  Finally, although the Court in *In re Tibco Software, Inc.*, No. 05-cv-2146, 2006 WL 1469654, at *21 (N.D.Cal. May 25, 2006), concluded that a stock repurchase program did not support an inference of scienter, it engaged in no analysis to explain that decision and, importantly, was not faced with

contemporaneous insider sales.[27]

### 3. The Complaint Alleges That Defendants Had Motive And Opportunity to Commit Securities Fraud

Although motive and opportunity to commit fraud "may no longer serve as an independent route to scienter," *Avaya*, 564 F.3d at 277, the Complaint includes a myriad of allegations concerning Defendants' motives and opportunity, which support that finding. "'Motive entails allegations that the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and wrongful nondisclosures.'" *In re RAIT*, 2008 U.S. Dist. LEXIS 103549, at *51, n.18 (quoting *Wilson v. Bernstock*, 195 F.Supp. 2d 619, 633 (D.N.J. 2002)); *see also Phillips v. LCI Int'l, Inc.*, 190 F.3d

---

[27]To the extent that Defendants' cases support the proposition that the existence of stock repurchase programs negate an inference of scienter, in addition to being distinguisable since they did not analyze insider sales that were timed to occur in connection with such programs, those cases also fail to account for the academic literature cited by Lead Plaintiff indicating that stock repurchase programs only support short-term share value and generally benefit insiders - research that supports an inference of scienter. At the very minimum, as the Court recently reasoned in *In re Viropharma Inc. Sec. Litig.*, No. 12-cv-2714, 2014 WL 2011317, at *10, n.23 (E.D. Pa. May 15, 2014), the Court should conclude that the stock repurchase program in this case does nothing to negate the strong inference of scienter created by the other facts pled in the Complaint:

> Defendants argue that the sales of insider trading are incongruent with the fact that ViroPharma engaged in a massive stock repurchase of 1.6 million shares during the class period. There are many inferences that a Court could draw from a stock repurchase. This Court is not persuaded that the existence of the stock repurchase plan wholly negates the strong inference of scienter, in light of other factors such as the conscious misbehavior and recklessness that Plaintiff has adequately pleaded. As such, this Court finds that the repurchasing plan weighs neither in favor of nor against an inference of scienter.

Here, under all of the circumstances, as in *In re Countrywide Financial Sec. Litig.*, 588 F.Supp.2d at 1187-1188, Lead Plaintiff respectfully submits that the adoption of the stock repurchase program at a time when the Individual Defendants were engaged in massive insider selling strongly supports an inference of scienter.

609, 621 (4th Cir. 1999)(same); *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 583 (D.N.J. 2001)(same); *Avaya*, 564 F.3d at 278 ("plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud.")  Here, Lead Plaintiff's allegations regarding the Individual Defendants' massive insider sales while the Company propped up the share price of PhotoMedex stock through its significant share repurchase program constitutes exactly the kind of well-pled allegations that support a finding of a concrete and personal benefit derived from the fraud by the Individual Defendants.  In fact, Defendants' desire to artificially inflate the Company's stock price can serve as compelling and cogent evidence of scienter.  *See, e.g., In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 647-48 (E.D. Va. 2000) (the success of the company's IPO and SPO based upon false statements contributed to finding of scienter); *In re Ibis Tech. Sec. Litig.*, 422 F. Supp. 2d 294, 317 (D. Mass. 2006) (a strong inference of scienter was found where plaintiffs alleged that defendants were motivated to delay an impairment charge in order to complete a stock offering); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 444 (S.D.N.Y. 2000) ("[Defendant company] had the most to win by inflating the price of the IPO, and was thus motivated to make statements or omit facts that would result in a higher price."); *In re Centocor, Inc. Sec. Litig. III,* No. 98-260, 1998 WL 964184, at *3 (E.D. Pa. Dec. 1, 1998) (scienter was adequately pled where plaintiffs alleged that defendants wanted to complete a public offering).

Defendants also ignore the fact that, as the Complaint pleads, most of Rafaeli's bonus compensation was paid in Company stock.  ¶ 20.  "[I]ncentive bonuses provide a 'concrete and personal benefit' sufficient to raise an inference of scienter."  *Malin v. XL Capital Ltd.*, 499 F.Supp.2d 117, 158 (D. Conn. 2007), *aff'd*, 312 Fed. Appx. 400 (2d Cir. 2009)(citing *In re*

*Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) (finding that "a $3 million bonus, more than two and a half times the defendant's salary, provided an even greater motive for inflating the appearance of [the company]'s financial performance, and, together with other sufficient motive allegations, supported an inference of scienter")); *see also Hemispherx*, 2014 WL 272027, at *12 ("the allegations in the complaint suggest that, at least as to Hemispherx and Carter, the defendants possessed ample motive and opportunity to commit the fraud in question," [s]*ee Avaya*, 564 F.3d at 276–79, and "[t]he change of control bonus provision gave Carter personal incentives relating to a stock sale in a way that departs from executives' typical compensation incentives.") Thus, the existence of Rafaeli's stock-based bonus compensation also supports a finding of scienter.

When all of these facts are read together holistically, Lead Plaintiff respectfully submits that the only logical (and plausible) conclusion is that scienter has been adequately pled as to all Defendants.

I. **Defendants' Quarrel With Lead Plaintiff's Confidential Witness Descriptions Is Without Merit**

Defendants half-heartedly challenge the sufficiency of Lead Plaintiff's descriptions of the confidential witnesses cited to in the Complaint and assert that the descriptions fail to provide sufficient indicia that the information they have provided is reliable. *See* Defs' Mem. at 17, n.7. That "challenge" cannot withstand careful scrutiny. The Complaint provides more than sufficient detail regarding each of the confidential witnesses to confirm the reliability of the information they have supplied. This is the manner that the Complaint details the basis for the confidential witnesses knowledge and reliability:

- Confidential Witness One ("CW1") [is] an individual who worked for Photomedex as a Vice President of Sales from shortly after the conclusion of the reverse merger between Radiancy and Photomedex for approximately eighteen (18) months and for the majority of the Class Period and reported directly to the Individual Defendants and the Company's Chief Operating Officer, Michael R. Stewart, and the Company's Executive Vice President, Giora Fishman. ¶ 22.

- Confidential Witness Two ("CW2") [is] a former employee of PhotoMedex who served as a Vice President of Research, Development and Engineering before the Class Period and who currently works for a competitor of PhotoMedex. ¶ 28.

- Confidential Witness Three ("CW3") [is] an individual who worked as a Marketing Manager for Radiancy in Israel before the reverse merger for a period of approximately eighteen (18) months between 2007 and 2009. *Id*.

- Confidential Witness Four ("CW4") [is] an individual who worked as a Purchasing Agent and then as a Product Manager at PhotoMedex for more than seven (7) years and for approximately half of the Class Period. *Id*.

Moreover, each of the allegations in the Complaint based upon these confidential witnesses is plainly within the scope of each witness' expected knowledge, based upon their knowledge and tenure with the Company or its predecessors, and all of the allegations are highly plausible, corroborative of each other and relate to information that would be within each witness' first-hand knowledge, ¶¶ 22, 28, 92-94,[28] and entirely consistent with the remainder of the well-pled

---

[28]Defendants' challenge to the confidential witness descriptions on the basis that the location of certain (but not all) of these witnesses' geographic work locations was not disclosed is unpersuasive where, as here, the specific titles and periods of employment of each witness are clearly stated and explained. *See Avaya*, 564 F.3d at 262 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (evaluating "whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge")); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008) (Although there are "reasons why courts may be skeptical of confidential sources cited in securities fraud complaints . . . [,] [c]onfidentiality . . . should not eviscerate the weight given [to these sources] if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame.") Indeed, given the small size of PhotoMedex and the provision of each confidential witness' job title and period of employment, Defendants likely already know or

Complaint.  As the Third Circuit Court of Appeals explained in *Avaya*, 564 F.3d at 263:

> In our view, the case law interpreting the Supreme Court's *Tellabs* opinion
> confirms the position we took in *Chubb*. The PSLRA imposes a particularity
> requirement on all allegations, whether they are offered in support of a statement's
> falsity or of a defendant's scienter. 15 U.S.C. § 78u-4(b)(1), (b)(2). In the case of
> confidential witness allegations, we apply that requirement by evaluating the
> "detail provided by the confidential sources, the sources' basis of knowledge, the
> reliability of the sources, the corroborative nature of other facts alleged, including
> from other sources, the coherence and plausibility of the allegations, and similar
> indicia." *Chubb*, 394 F.3d at 147.  If anonymous source allegations are found
> wanting with respect to these criteria, then we must discount them steeply. This is
> consistent with *Tellabs*'s teaching that "omissions and ambiguities count against
> inferring scienter" under the PSLRA's particularity requirements. *Tellabs*, 127 S.
> Ct. at 2511.  If, on the other hand, a complaint's confidential witness allegations
> are adequately particularized, we will not dismiss them simply on account of their
> anonymity. In short, *Chubb* remains good law.

In sum, the Complaint provides more than sufficient basis to rely upon the averments based upon

information related by confidential witnesses, all of whom are former employees of Defendant or

its predecessor, Radiancy.

**J.    The Complaint More Than Adequately Pleads Loss Causation**

In *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2186 (U.S. 2011)

("*Halliburton I*"), the Supreme Court cogently explained the differences between transaction

causation and loss causation:

> We have referred to the element of reliance in a private Rule 10b-5 action as
> "transaction causation," not loss causation.  *Dura Pharmaceuticals*, *supra*, at

---

could easily discern the identity of each and every confidential witness.  Similarly, Defendants'
complaint that some of the confidential witnesses were not employed during all or part of the
Class Period, when the knowledge and information attributed to them relates to the time period
in which they worked for PhotoMedex or its predecessor (or information to which they would be
privy in their current positions), borders on the nonsensical.  Of course, if the Court determines
that the descriptions or details provided with respect to the confidential witnesses are deficient in
any respect, Lead Plaintiff stands ready to cure such deficiency and requests that leave to amend
be granted to do so.

341-342, 125 S. Ct. 1627 (citing *Basic*, *supra*, at 248-249, 108 S. Ct. 978). Consistent with that description, when considering whether a plaintiff has relied on a misrepresentation, we have typically focused on facts surrounding the investor's decision to engage in the transaction. *See Dura Pharmaceuticals*, *supra*, at 342, 125 S. Ct. 1627. Under *Basic*'s fraud-on-the-market doctrine, an investor presumptively relies on a defendant's misrepresentation if that "information is reflected in [the] market price" of the stock at the time of the relevant transaction. *See Basic*, 485 U.S., at 247, 108 S. Ct. 978.

Loss causation, by contrast, requires a plaintiff to show that a misrepresentation that affected the integrity of the market price ***also*** caused a subsequent economic loss. As we made clear in *Dura Pharmaceuticals*, the fact that a stock's "price on the date of purchase was inflated because of [a] misrepresentation" does not necessarily mean that the misstatement is the cause of a later decline in value. 544 U.S., at 342, 125 S. Ct. 1627 (emphasis deleted; internal quotation marks omitted). We observed that the drop could instead be the result of other intervening causes, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Id.*, at 342-343, 125 S. Ct. 1627. If one of those factors were responsible for the loss or part of it, a plaintiff would not be able to prove loss causation to that extent. This is true even if the investor purchased the stock at a distorted price, and thereby presumptively relied on the misrepresentation reflected in that price.

The standard to plead loss causation is established and subject to the requirements of

Fed.R.Civ.P. 8. As the Supreme Court explained in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336,

346 (2005):

> [The] Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2). And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss. But, even so, the "short and plain statement" must provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 (1957).

Moreover, *as In re Cigna Corp. Sec. Litig.*, 459 F. Supp. 2d 338, 349 (E.D. Pa. 2006), teaches:

> Regarding loss causation, a plaintiff must prove that there is a sufficient causal nexus between the loss and the alleged misrepresentation. *Id*; *see also*, *e.g.*, *In re Royal Dutch/Shell Transp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 32190 (D.N.J. Dec. 12, 2005). In a fraud on the market case, a plaintiff may establish the element of loss causation by showing (1) that he or she purchased a security at a market price that was artificially inflated due to a fraudulent misrepresentation, and (2) that the stock price "dropped in response to disclosure of the alleged misrepresentation." *Semerenko*, 223 F.3d at 184-86.

As the Court explained in *Varghese v. China Shenghuo Pharm. Holdings*, 672 F. Supp. 2d 596, 609 (S.D.N.Y. 2009), "Plaintiffs allege that when CSP issued its corrective disclosure on August 20, 2008, its share price fell from $2.33 per share to $1.89 a share" and "[t]he Court finds that this allegation is a sufficient showing of loss causation and economic damages to survive a motion to dismiss."

Here, the Complaint easily meets these standards. In paragraphs 104-115, the Complaint cogently pleads, *inter alia*, as follows:

- The market for PhotoMedex common stock was open, well-developed, and efficient at all relevant times. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and course of conduct that artificially inflated the price of PhotoMedex common stock and operated as a fraud or deceit on Class Period purchasers of PhotoMedex shares by failing to disclose or misrepresenting certain facts regarding its key product and crucial market in Japan. ¶ 104.

- As a result of Defendants' materially false and misleading statements and material omissions as alleged herein, PhotoMedex common stock traded at artificially inflated prices during the Class Period, reaching as high as $16.92 on June 5, 2013. ¶ 105.

- Lead Plaintiff and the Class purchased or otherwise acquired PhotoMedex common stock relying upon market information relating to PhotoMedex and the integrity of the market price of PhotoMedex common stock, thus causing

economic loss and the damages complained of herein when the truth and/or the effects thereof were completely revealed and the artificial inflation was removed from the price of PhotoMedex common stock. ¶ 106.

- Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Lead Plaintiff and the Class. ¶ 107.

- But for Defendants' misrepresentations and omissions, Lead Plaintiff and the other members of the Class would not have purchased PhotoMedex common stock at the artificially inflated prices at which they were purchased. ¶ 108.

- On October 17, 2013, TheStreetSweeper.org published a report entitled, "PhotoMedex: Just say No!No!" raising serious risks and concerns regarding, among other things, the effectiveness of the no!no! device, as evidenced by the more reliable critical clinical test, and the Company's prospects in Japan. As a direct result of that disclosure and as the market began absorbing the information despite the barrage of misinformation Defendants had published since the reverse-merger, the price of PhotoMedex began dropping, first falling from $15.41 to $14.91 on October 17, 2013 on unusually heavy volume of 526,200 shares, and then slipping to $12.78 on November 5, 2013, the day before the second wave of bad news hit regarding the Company. In the span of a little over two (2) weeks, the share price had declined more than 17%. ¶ 109.

- Then on November 6, 2013, the Company issued a second release, disclosing that its sales in Japan had collapsed, and giving more credibility to and corroborating the October 17, 2013 TheStreetSweeper.org report. On that news, the share price fell a further 8.8%, on trading volume of over 1 million shares, for an aggregate decline of 21.8% for the October 17, 2013 to November 6, 2013 period. These decreases were the result of the revelations of facts that had previously been concealed and/or misrepresented and caused the price of the Company's common stock to be artificially inflated, and this price decrease cannot be attributed either to general market or industry-wide events. ¶ 110.

- In contrast to the sharp decline in the price of PhotoMedex common stock during the period from October 17, 2013 to November 6, 2013, the Advanced Medical Equipment & Technology Sector (NEC) declined a mere 1.2%, while the NASDAQ Health Care Index (IXHC) declined by 2.8%. Nor were the share prices of the three public companies cited as competitors in PhotoMedex's 2013 annual report filed on Form 10-K in March 2014 affected during the October 17, 2013 to November 6, 2013 period: Syneron Medical Ltd. (NASDAQ: ELOS) grew 3.1%; Cynosure Inc. (NASDAQ: CYNO) grew by 2.7%; and Valeant Pharmaceuticals, Inc. (NYSE: VRX) declined by 4.9%. ¶ 111.

- Class Members who purchased PhotoMedex common shares during the Class Period and continue to hold those shares after the Class Period corrective disclosures have sustained economic injury resulting from the decline in value resulting from the revelations on October 17, 2013 and November 6, 2013. Members of the Class who purchased PhotoMedex common stock during the Class Period and sold those shares after the end of the Class Period have suffered economic injury caused by Defendants' misrepresentations and/or omissions during the Class Period and did not fully come to light until November 6, 2013. ¶ 113.

- The damages suffered by Lead Plaintiff and other members of the Class were direct and proximate results of Defendants' fraudulent scheme to artificially inflate the price of PhotoMedex common stock, the disclosures of which caused the subsequent significant declines in the value of PhotoMedex common stock. ¶ 114.

- The foregoing allegations demonstrate that Lead Plaintiff's damages were caused by the scheme to defraud as alleged herein, and negate any inference that Lead Plaintiff and the Class' losses were the result of general market conditions or other factors wholly unrelated to the false and misleading information complained of herein. ¶ 115.

In response to these clear averments, Defendants weakly argue that the corrective disclosures provided no new information to the market about the efficacy of the no!no! device and, therefore, cannot be actionable. Notably, Defendants never (1) offer a competing explanation as to why PhotoMedex's stock was punished when information regarding the efficacy of the no!no! device was communicated to the market by TheStreetSweeper.org report at the same time that its competitors' share prices were performing well, or (2) argue that the unquestionably new information that the Company's sales in the key Japanese market had ceased in their entirety. Those omissions are fatal to Defendants' loss causation arguments.

Furthermore, Defendants' loss causation arguments should be recognized for what they truly are -- a truth on the market defense (not amenable to resolution on a motion to dismiss, as explained above) masquerading as a loss causation defense. In fact, Defendants' citation to

*Turner v. magicJack VocalTec, Ltd.*, No. 13 Civ. 0448, 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014), as the key case in support of its loss causation argument, instead of assisting Defendants' cause, actually proves Lead Plaintiff's point. As the court in the *Turner* case explained:

> Plaintiffs assert that a statement in the March 15, 2012 Year–End 2011 10–K that there was "a higher percentage of magicJack units being sold to retailers and distributors at wholesale prices as opposed to direct sales to customers at retail prices" was false (Compl. ¶ 117) because on the same page of the same 2011 10–K it states that "in 2011 and 2010, sales of the magicJack and magicJack plus units through retail outlets represented approximately 57% and 73% respectively."(Compl. ¶ 118.) A statement cannot be misleading where the corrective disclosure was made on the same page of a prospectus, and as such cannot be the basis for a decline in stock price. *See Meyer Pincus & Assoc, P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 763 (2d Cir.1991). Plaintiffs also fail to cite any market reaction corresponding to the alleged corrective disclosure. Similarly, Plaintiffs assert that the Company "manipulated and understated the depreciation expense of certain assets" by "arbitrarily chang[ing] the estimated useful life of its switches and other ancillary equipment from 3 years to either 10 or 15 years," (Compl. ¶¶ 70, 72), but do not allege any facts supporting a market reaction corresponding to this disclosure. Plaintiffs also do not allege any specific market reaction attributable to the disclosure of the put position in the Q2 10–Q.
>
> In any event, the Copperfield Report acknowledges that "all information contained [in the report] has been obtained from public sources." ***In cases where, as here, Defendants have not otherwise misrepresented the public facts upon which such a report is predicted, the report cannot establish loss causation***. *See e.g.*, *Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 187 (4th Cir. 2007) ("The problem with plaintiffs' theory ... is that these facts had already been disclosed in public filings, so their [subsequent] revelation ... could not have caused [the] stock price to decline."); *In re Comnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir.2010) ("negative ... characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the [author's] opinions"); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ 975, 2012 WL 1646888, at *31 (S.D.N.Y. Mar. 4, 2013) ("[i]nvestors cannot establish loss causation merely by relying on after-the-fact negative characterization of already public information); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F.Supp.2d 349, 363 (S.D.N.Y. 2008) ("The mere negative characterization of existing facts that were never hidden from investors does not permit [plaintiffs] to plead loss causation.").
>
> Plaintiffs' cited precedent is not to the contrary. In *In re Winstar Communications*, No. 01 Civ. 3014, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006), the court found

that fact reports based on publicly available information did not negate loss causation or materiality where the public information was "***contrary to false statements made by the defendants***" and "***[t]he reports also revealed [defendants'] questionable accounting practices, of which the public had not previously been made aware***." *Id.* at *15. Similarly, in *Forgarazzo v. Lehman Bros, Inc.*, 341 F.Supp.2d 274, 290 (S.D.N.Y. 2004), the court held that even where the "true facts were available for the world to see," the later reports of these facts were sufficient to show loss causation ***where the defendant issued inaccurate and misleading statements about the objective facts*** to "obscure the conclusion" that the defendant's company was failing. In contrast, where, as here, a defendant has properly disclosed the public information later reported, and where no facts support allegations of material misstatements, investors cannot establish loss causation merely by relying on an after-the-fact "negative characterization of already-public information." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir.2010).

*Id.* at *13-14 (emphasis added). But here, as Defendants critically ignore, the Complaint specifically pleads that Defendants issued false and misleading statements about the efficacy of the no!no! device throughout the Class Period and that the true state of affairs in Japan was not disclosed until the corrective disclosures at the close of the Class Period. ¶¶ 78-86. Thus, this case is entirely distinguishable from the facts in *Turner* and is much more akin to the circumstances in *In re Winstar Communications* and *Forgarazzo*, *supra*, where, as here, loss causation was adequately pled. *See also Halliburton Co. v. Erica P. John Fund, Inc.*, No. 13-317, 2014 U.S. LEXIS 4305, at *34-35 (U.S. June 23, 2014) ("*Halliburton II*") (acknowledging that materiality of representations is based on whether they would have "'been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (quoting *Basic*, *supra*, at 231-232, 108 S. Ct. 978)), and thereby confirming that, as Defendants consistently ignore, the manner in which Defendants influenced the mix of information through their misrepresentations and omissions is the question of fact to be addressed in connection with

their "truth on the market" defense that pervades their entire Motion to Dismiss.[29]

### K.    Defendants' "Reservation Of Rights" In Anticipation Of Halliburton II Provides No Additional Basis To Argue For Dismissal Of The Complaint

Defendants' "reservation of rights" in anticipation of the Supreme Court's recent decision in *Halliburton II* amounted to, at best, wishful thinking and provides significant insight into Defendants' desperate desire to avoid discovery with respect to the facts and evidence in this case. Unfortunately for Defendants, *Halliburton II* only serves to emphasize why Defendants' Motion to Dismiss is inappropriate under the facts of this case.

In *Halliburton II*, the Supreme Court granted certiorari "to resolve a conflict among the Circuits over whether securities fraud defendants may attempt to rebut the *Basic* presumption at the class certification stage with evidence of a lack of price impact." *Id*. at *15. In *Halliburton II*, the Supreme Court reaffirmed the fundamental holdings in *Basic* that "[t]o recognize the presumption of reliance, the Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Id*. at *24, quoting *Basic*, 485 U.S. at 248, n.28. Rather, as the Supreme Court explained, the *Basic* presumption is "based ... on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" *Id*. at *24, quoting *Basic*, 485 U.S. at 246, n.24. And, as the Supreme Court teaches in *Halliburton II*, "*Basic*'s presumption of reliance thus does not rest on a

---

[29]Defendants effectively (albeit inadvertently) concede this issue when they state that "[c]onsumer complaints are therefore relevant, if at all, only insofar as an investor would regard them as material to his or her valuation of PhotoMedex's stock." Defs' Mem. at 17. In other words, consumer complaints are relevant to the extent they impact the total mix of information and depending on how well publicized and communicated to the market these complaints have been.

'binary' view of market efficiency [and] [i]ndeed, in making the presumption rebuttable, *Basic*

recognized that market efficiency is a matter of degree and accordingly made it a matter of

***proof***." *Id.* (emphasis added.)  By recognizing market efficiency is a matter of degree and ***proof***,

*Halliburton II* effectively recognized that such issues (i.e., with respect to transaction causation)

are not amenable to resolution upon a motion to dismiss.  Consistent with that decision,

*Halliburton II* also held that "[e]ven if plaintiffs need not directly prove price impact to invoke

the *Basic* presumption, . . . defendants should at least be allowed to defeat the presumption at the

class certification stage through evidence that the misrepresentation did not in fact affect the

stock price." *Id.* at *37.  Thus, as *Halliburton II* makes crystal clear, Defendants can submit

***evidence*** regarding price impact if they wish to contest class certification, but *Halliburton II*

provides no cause or basis for any additional arguments by Defendants in support of their request

for dismissal of the Complaint.

### L. The Complaint Adequately Pleads A Section 20(a) Claim Against The Individual Defendants

Lead Plaintiff also asserts a claim under Section 20(a) of the Exchange Act against the

Individual Defendants.  Section 20(a) creates a cause of action against individuals who exercise

control over a "controlled person," including a corporation, that has committed a violation of

Section 10(b).  15 U.S.C. §78t(a); *Avaya*, 564 F.3d at 252; *In re Suprema Specialists, Inc. Sec.

Litig.*, 438 F.3d 256, 284 (3d Cir. 2006).  Accordingly, liability under Section 20(a) is derivative

of an underlying violation of Section 10(b) by the controlled person.  *Avaya*, 564 F.3d at 252.[30]

---

[30]Once an inference of control is raised, the burden shifts to defendants to establish lack
of culpable participation or knowledge.  *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302,
1305 (10th Cir. 1998).  Furthermore, issues of control liability are highly fact intensive and are
"not ordinarily resolved summarily at the pleading stage."  *In re Cabletron Sys., Inc.*, 311 F.3d

Defendants do not argue that they are not control persons. Rather, they merely argue that the Complaint did not allege an underlying Section 10(b) violation, and so it failed to allege a derivative claim under Section 20(a). Defs' Mem. at 36. In light of the derivative nature of the claim, if the Court finds that the Complaint alleges a Section 10(b) claim, it must also conclude that it alleges a Section 20(a) claim against Defendants, Rafaeli and McGrath, as Defendants' Motion effectively concedes. *Id.*

## M.     In The Alternative, The Court Should Grant Leave To Amend The Complaint

If the Court concludes that Lead Plaintiff did not adequately plead any of the foregoing claims, Lead Plaintiff requests leave to amend the Complaint. Rule 15(a) of the Federal Rules of Civil Procedure requires leave to amend a pleading to be "freely given when justice so requires." *See also Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003); *Ruggles v. Wellpoint, Inc.*, 687 F. Supp. 2d 30, 33 (N.D.N.Y. 2009) (granting plaintiff's motion to amend). Leave to amend should be denied only in the face of undue delay, bad faith, undue prejudice to the non-movant, futility of amendment, or where the movant has repeatedly failed to cure deficiencies in previous amendments. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Kropelnicki v. Siegel*, 290 F.3d 118, 130 (2d Cir. 2002) (citing *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 271-72 (2d Cir. 1996)). It is Defendants' burden to establish that Lead Plaintiff's request for leave to amend should have been denied. *See New York v. Panex Indus., Inc.*, No. 94-cv-0400-ECH, 1997 U.S. Dist. LEXIS 3163,

---

11, 41 (1sr Cir. 2002) (recognizing that "the issue raises a number of complexities that should not be resolved on such an underdeveloped record.") In fact, courts have held that dismissal of a Section 20(a) claim should only be granted where a "plaintiff does not plead any facts from which it can reasonably be inferred the defendant was a control person." *Maher*, 144 F.3d at 1306.

at *2 (W.D.N.Y. Mar. 14, 1997) ("The party opposing a motion for leave to amend has the burden of establishing that granting such leave would be unduly prejudicial.") (citing *Saxholm AS v. Dynal, Inc.*, 938 F. Supp. 120, 123 (E.D.N.Y. 1996)). This requires the Defendants to "do more than simply claim to be prejudiced." *Bryn Mawr Hosp. v. Coatesville Elec. Supply Co.*, 776 F. Supp. 181, 185 (E.D. Pa. 1991). Defendants would not be able to satisfy their burden in this case, and there is no bad faith on the part of Lead Plaintiff. Furthermore, at this early stage of the litigation, before discovery, there would be no undue delay or prejudice to Defendants should Lead Plaintiff's motion for leave to amend be granted.

## V.    **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss Lead Plaintiff's Complaint should be denied in its entirety, or in the alternative, Lead Plaintiff's request for leave to amend the Complaint should be granted. Lead Plaintiff respectfully submits a proposed Order for the Court's consideration, which is attached as Exhibit "A."

Dated: July 14, 2014                Respectfully submitted,


                                    /s/ James C. Shah
                                    Scott R. Shepherd
                                    James C. Shah
                                    Eric L. Young
                                    SHEPHERD, FINKELMAN, MILLER
                                     & SHAH, LLP
                                    35 East State St.
                                    Media, PA 19063
                                    Telephone: (610) 891-9880
                                    Facsimile:  (866) 300-7367
                                    Email: sshepherd@sfmslaw.com
                                            jshah@sfmslaw.com
                                            eyoung@sfmslaw.com

James E. Miller
Laurie Rubinow
Karen Leser-Grenon
SHEPHERD, FINKELMAN, MILLER
   & SHAH, LLP
65 Main St.
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
       lrubinow@sfmslaw.com
       kleser@sfmslaw.com

Rose C. Luzon
Kolin C. Tang
SHEPHERD, FINKELMAN, MILLER
   & SHAH, LLP
401 West A Street, Suite 2350
San Diego, CA 92101
Telephone: (619) 235-2416
Facsimile:  (866) 300-7367
Email: rluzon@sfmslaw.com
       ktang@sfmslaw.com

**Attorneys for Lead Plaintiff**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that, on July 14, 2014, the foregoing was served by the Court's ECF system, as well as independently by electronic and first class mail upon counsel for Defendants set forth below:

William P. Quinn, Jr.
Karen Pielsak Pohlmann
Laura Hughes
Morgan, Lewis & Bockius, LLP
1701 Market Street
Philadelphia, PA 19103-2921
Email: wquinn@morganlewis.com
kpohlmann@morganlewis.com
lehughes@morganlewis.com

A true and correct copy of the foregoing also will be delivered to the Honorable Paul S. Diamond on July 15, 2014 and addressed as follows:

The Honorable Paul S. Diamond
6613 United States Courthouse
601 Market Street
Philadelphia, PA 19106

Dated: July 14, 2014          /s/ James C. Shah